693 A.2d 17

**Barbara M. HIDER, et al.**

v.

**DEPARTMENT OF LABOR, LICENSING AND REGULATION, et al.**

No. 687, Sept.Term, 1996.

Court of Special Appeals of Maryland.

April 30, 1997.

---

260

Frank C. Hider (Hider & Associates, P.C., Dallas, TX, and Karen Kiefer, Severna Park, on the brief), for Appellants.

Lynn Miller Weiskittel, Assistant Attorney General, Baltimore (J. Joseph Curran, Jr., Attorney General and Andrew D. Auerbach, Assistant Attorney General, Baltimore, on the brief), for appellee DLLR.

Norman R. Buchsbaum (Lynn K. Edwards, on the brief), Baltimore, for appellee North Arundel Nursing & Convalescent Center.

Argued before MURPHY, C.J., and WENNER and SALMON, JJ.

SALMON, Judge.

The main legal issue to be resolved in this case is whether an employee may be disqualified from receiving unemployment compensation insurance if the employee is fired for unintentional misconduct. This is an issue of first impression, which we answer in the negative, based on our interpretation of the term "misconduct" as used in Maryland Code Annotated, Labor and Employment section 8–1003 (Supp.1996).

Barbara Hider and Virginia White (appellants), employees of the North Arundel Nursing & Convalescent Center, Inc. (the Nursing Home), were fired on October 7, 1994, for an

incident that occurred at the Nursing Home on October 6, 1994. Ms. Hider, a registered nurse, had worked as Assistant Director of Nursing at the Nursing Home for five years prior to her discharge. Ms. White, a licensed practical nurse, had been a nursing supervisor for over two years before her discharge.

The Office of Unemployment Insurance of the Maryland Department of Economic and Employment Development (DEED) conducted a fact-finding hearing to determine whether appellants were separated from their employment for a "disqualifying reason" within the meaning of Maryland Code Annotated, Labor and Employment sections 8–1001 to 8–1003 (Supp.1996). The Office of Unemployment Insurance, in separate notices dated Nov. 15, 1994, concluded: "Insufficient *information has been presented to show misconduct in connection with the work.* As a result the circumstances surrounding the separation do not warrant a disqualification under section 8–1002 or 8–1003 of the Maryland Unemployment Insurance Law."

The Nursing Home appealed the decisions and a hearing was held on January 23 and January 24, 1995, before the Appeals Division of DEED.[1] In a written decision dated February 3, 1995, Hearing Examiner Kevin M. O'Neill found:

> The claimants were terminated by the employer on or about October 7, 1994, for failing to respond to an emergency situation. The claimants presented numerous witnesses and documentation to support a finding that *they were not aware* of an emergency situation with a specific patient.

(Emphasis added.) He concluded that the claimants "apparently misunderstood the gravity of the situation" and "used poor judgment." He held that their "misjudgment in this ... case amounts to misconduct" connected with employment within the meaning of Labor and Employment section 8–1003.

---

1. Because both appeals involved the same facts and circumstances, they were consolidated by the Appeals Division.

Accordingly, appellants were denied unemployment insurance benefits for ten weeks.

The Board of Appeals of DEED [2] (the Board), in separate but identical decisions, dated April 3, 1995, adopted the findings of fact and conclusions of law of Hearing Examiner O'Neill.

On April 20, 1995, in the Circuit Court for Anne Arundel County, appellants filed a Petition for Judicial Review of the Board's decision. Both the Nursing Home and DEED notified the circuit court of their intent to participate in the appeal.

The Nursing Home filed a motion to dismiss the appeal, on November 20, 1995, alleging that appellants failed to either file a timely memorandum pursuant to Maryland Rule 7–207(a) or to timely seek a filing extension. On December 8, 1995, Judge Robert H. Heller heard arguments on the Nursing Home's motion to dismiss. Judge Heller denied the motion but entered a judgment of $500 against appellants for a portion of the Nursing Home's attorney's fees.

The circuit court (Goudy, J., presiding), after hearing arguments, affirmed the Board's decision. Appellants filed a timely appeal raising three issues,[3] which we have rephrased and reordered:

I. Whether appellants were discharged from the Nursing Home for the same behavior that the Board found to be misconduct.

II. Whether the Board erred as a matter of law by concluding that appellants' misjudgment amounted to miscon-

---

2. The Board of Appeals, formerly a unit of the Department of Economic and Employment Development (DEED), was transferred to the Department of Labor, Licensing and Regulation (DLLR), effective July 1, 1995. *See* Md.Code Ann., Labor & Emp. § 8–101(f) (1991 Repl.Vol. & Supp. 1996). For convenience, we shall refer to DLLR as DEED in this opinion.

3. Appellants also present the following issue for our determination: Whether the Nursing Home satisfied its burden of proof under section 8–1003. It is unnecessary to resolve this issue.

duct within the meaning of section 8–1003 of the Labor and Employment Article.

III. Whether the circuit court erred in entering a judgment of $500 against appellants to reimburse the Nursing Home for certain attorney's fees.

## FACTS

The incident leading up to the discharge of Ms. White and Ms. Hider involved the care of a sixty-nine year old chronically ill patient (the patient) at the Nursing Home, on October 6, 1994. In the words of his physician, the patient was a "very seriously ill gentleman," who had been "in and out of the hospital many, many times during his admission" at the Nursing Home. The patient had been the victim of several heart attacks and suffered from recurrent pneumonia. He often moaned and got agitated and, to calm him, Ativan and Tylenol were prescribed. His mental faculties were adversely affected by his heart ailment, and as of October 6, 1994, the patient was getting progressively sicker and weaker.

After the incident in question, the patient was transferred from the Nursing Home to North Arundel Hospital for "evaluation." A "transfer summary" by North Arundel Hospital noted that the patient was "diaphoretic" (profusely sweating) and was "agitated and chanting." The patient was admitted to the hospital to rule out a "cardiac event." He remained in the hospital for two weeks and was discharged with a diagnosis of pneumonia in both lungs.

### The Multi–Purpose Room Incident

A considerable portion of the testimony presented to the Hearing Officer was devoted to events that allegedly took place in the multi-purpose room at the Nursing Home on October 6, 1994.

According to witnesses testifying on behalf of the Nursing Home, at approximately 12:30 p.m. on that date, Sandra Osborne, Lorraine Hill, Melinda Miller, Charlene Roberto, and appellants were present in the multi-purpose room. The

Nursing Home's witnesses testified that while Ms. White was in the room she was paged by Robin Anderson, LPN, the nurse in charge of the patient. Ms. Osborne remembered that Ms. White answered the page and was advised of the patient's grave condition; Ms. White then instructed Ms. Anderson to call the patient's physician for input. Several witnesses testified that after finishing the conversation, Ms. White asked if anyone had heard the patient complain about "his heart hurting." According to Ms. Osborne, the following events then took place:

Ms. Osborne: Melinda Miller [LPN] stated she had never heard him make a statement like that, it sounded serious.

[Counsel]: And was there any reaction from anyone?

Ms. Osborne: They discussed it back and forth—

[Counsel]: And then what happened?

Ms. Osborne: Barbara Hider was sitting in a chair. She was writing out a care plan, and they [White and Hider] got up to leave out of the multi-purpose room. Barbara Hider said, "What about the food in the car?" [4]

. . . .

[Counsel]: And what did Ms. White say, if anything?

Ms. Osborne: She said, "Well, we'll get the food out of the car, and then we'll dial 911 when we get back." [5]

Ms. Osborne remembered that appellants were laughing when they left the multi-purpose room. The Nursing Home's witnesses also testified that after appellants left the room, Ms. Miller also left to check on the patient.

In contrast, both Ms. White and Ms. Hider testified that they neither heard nor answered a page from Ms. Anderson. Ms. Anderson, who testified on behalf of appellants, partially

---

4. According to Ms. Osborne and the other witnesses, Ms. Hider was referring to food for an employee's bridal shower, which was to be held later in the day.

5. Ms. Hill confirmed the statement attributed to Ms. White, while Ms. Miller testified that Ms. White stated, "with my luck, I'll have to call 911 when we come back in."

corroborated their version of the events. She testified that the patient's family had told her that he was moaning, "My heart, my heart." She paged Ms. White because she "wasn't quite sure what to do, because he [the patient] does this so often." Ms. Anderson further testified that someone answered her page, and that, although she did not recognize the voice, at the time she "assumed" it was Ms. White. She testified that she was not sure if she, in fact, spoke with Ms. White, "because the person didn't identify" herself and because, minutes later, when she met Ms. White and Ms. Hider in the hallway, Ms. White "didn't understand what I was talking about." [6]

The Hearing Examiner did not credit the testimony of the Nursing Home's witnesses regarding the events in the multipurpose room:

> Much testimony was produced with regard to activities that occurred in the morning in the multi-purpose room. This Hearing Examiner does not find as fact that either part[y] heard a page in that multi-purpose room. It is clear that both claimants spoke to Ms. Anderson prior to exiting the building.... Ms. Anderson had made a page minutes prior believing that she had communicated with Ms. White. Ms. Anderson may not have communicated with Ms. White on a prior page.

### The Hallway Conversation

Although the Hearing Examiner determined that neither Ms. Hider nor Ms. White were informed of the patient's condition as a result of the page to the multi-purpose room, he concluded that they were informed of Ms. Anderson's concern for the patient's condition in a hallway conversation prior to their exit from the building. The testimony of Ms. Hider, Ms.

---

**6.** Ms. Anderson testified that in the past Ms. Miller had responded when she paged Ms. White. She said: "I don't remember what I had been calling for, but I know there was one time when I had called Ginny White and the voice didn't sound right, and after I started talking to the person I said, 'Is this Ginny,' and she said, 'No, this is Melinda [Miller].' "

White, and Ms. Anderson confirms that such a conversation took place.

Ms. Anderson testified that, after she explained the patient's condition to the person answering her page, she was told to call the doctor. Dr. O'Chaney, the patient's regular physician, testified that when Ms. Anderson called him she said that the patient was "agitated" and moaning "My heart, my heart." When Dr. O'Chaney asked Ms. Anderson if she thought the patient was having chest pains, she replied that "it's hard to tell ... because he's acting the same as he does every day." Dr. O'Chaney understood her problem because the patient was "a difficult patient to assess most of the time, because of his mental condition." Ms. Anderson asked Dr. O'Chaney if she could "send him out" via 911.[7] Dr. O'Chaney instructed her to give the patient Ativan and Tylenol and to "wait and watch what happens." From the information that Nurse Anderson conveyed to Dr. O'Chaney, he did not think that it was an emergency situation, and thus, he told her that she should not transfer the patient to a hospital via 911.

After speaking with Dr. O'Chaney, Ms. Anderson was still concerned about the patient because she "really felt that he should be sent out" to be evaluated, "even if he wasn't having chest pains." Ms. Anderson decided to talk to Ms. White "again." As she got up from her desk, she saw Ms. White and Ms. Hider walking down the hall. She told both of them that she had spoken with Dr. O'Chaney and that he didn't want the patient sent to the hospital. According to Ms. Anderson, Ms. White "didn't act like she quite understood what I was talking about" and she asked questions such as "why did you call the doctor" and "what is [the patient] doing." During the conver-

---

**7.** In a memo to the Nursing Home's "Professional Staff," dated September 15, 1993, Marcy Ely, Director of Nursing, explained that when a patient experiences significant changes such as chest pain, profuse bleeding, significant pain, significant change in vital signs, or respiratory distress:

Resident shall be assessed and immediately transferred via 911 to hospital. Order shall be obtained from attending physician or medical director. *BUT* if unable to reach physician immediately, 911 can be initiated by staff.

sation, Ms. Anderson informed appellants that she had not yet taken the patient's vital signs.

Ms. White and Ms. Hider testified that they instructed Ms. Anderson to get the patient's vital signs and assess his condition. They advised her that they would return shortly. The two then left the building and went to the parking lot to get food for an employee's bridal shower. Ms. Anderson never evaluated the patient, however, because on her way to his room Ms. Miller waved to her and told her, "We're sending him out." Ms. Miller explained that she had been in the patient's room, that he was sweating profusely with a rapid pulse rate of 104, and that she had called 911.[8]

At the hearing, Ms. Anderson admitted that, while in the hallway, she did not tell Ms. Hider and Ms. White that the patient was sweating profusely because "he wasn't real diaphoretic when I saw him." Ms. White testified that Ms. Anderson did not request her or Ms. Hider's assistance, nor did she indicate that there was an emergency: "[S]he was just giving me a general update like the other nurses do periodically through the day." Ms. Anderson admitted that she did not use the word "emergency" when speaking to Ms. Hider and Ms. White. When Ms. Anderson was asked whether, during the hallway conversation, she indicated in any way to appellants that it was an emergency, she replied somewhat ambiguously:

Yes, I did, in the way that I was concerned that he had said that he was having chest pains. And that ... I thought that he should be evaluated, sent out.

Regarding the hallway conversation, the Hearing Examiner found:

The charge nurse, Robin Anderson, notified her Supervisor, Ms. White and the Assistant Director of Nursing, Ms. Hider, that she had a great concern for a specific patient.

---

8. Dr. O'Chaney testified that when he spoke with Ms. Anderson he did not know the patient was sweating profusely. He opined that it would be an emergency if a patient was sweating profusely and experiencing chest pains. Dr. O'Chaney also testified that a patient with pneumonia may experience severe chest pains.

Ms. Anderson informed them that she had called the doctor with regard to her concern for the patient. Ms. Anderson was seeking advice and opinion from her two supervisors, because of her concern for a patient. Ms. Anderson testified credibly that she believed it was an emergency situation, but did not use these words. The claimant, [ ] Ms. White, and Ms. Hider did not follow Ms. Anderson back to the patient's room. They proceeded to the parking lot to receive personal items which were to be used later during the day.

### The Decision to Terminate

Sandra Mennerick, Administrator of the Nursing Home, investigated the events of October 6, 1994, and made the decision to terminate Ms. Hider and Ms. White. She testified that, on October 6, she was informed of the incident in the multi-purpose room by Sandra Osborne. On October 7, 1994, she spoke with Marcy Ely, Nursing Director, who agreed to conduct an investigation of the incident.

According to Ms. Mennerick, Ms. Ely spoke with appellants, and they both denied being in the multi-purpose room.[9] As a result, both Ms. Ely and Ms. Mennerick determined that "someone's lying." To clarify the matter, Ms. Ely and Ms. Mennerick called Lorraine Hill, Volunteer Supervisor, into Ms. Mennerick's office and asked her to describe what had happened in the multi-purpose room. Ms. Hill confirmed Ms. Miller's and Ms. Osborne's versions of the incident.

As a result of their investigation, Ms. Ely and Ms. Mennerick decided that Ms. Hider and Ms. White must be terminated immediately.[10] Ms. Mennerick called Ms. Hider and Ms. White into her office, and the following took place:

---

9. Ms. Hider testified that she did not deny being in the multi-purpose room that day; rather, she told Ms. Ely that she was not in the room when Ms. Anderson paged Ms. White.

10. When asked why it was "so terrible" that Ms. Hider and Ms. White left the building, Ms. Mennerick stated: "The way it had been reported to me, the patient was in distress, and needed assistance, and they had been involved in his case at that point. And they chose to leave the facility over going to care for the patient."

Ms. Mennerick: The four of us [Mennerick, Ely, White & Hider] started to discuss the situation. . . . Barbara [Hider] did most of the talking, and Barbara was emphatic that she was not in the room, she had never been in the room the entire day, and was not in there. And I said to her, "Well, I saw you in there myself. I saw you earlier in there at the back table." And she said, "I was never in there. I wasn't in there the entire day. I was never in the room. I know nothing about this."

. . . .

[Counsel]: So how did the conversation proceed after that?

Ms. Mennerick: So the four of us, and I don't remember the exact words or in exactly what order people were talking, except that Marcy [Ely] reiterated again her concern about [the patient] that they had left the building; about the statement about his heart hurting, their denying that they knew anything about that, that they never heard him say anything like that. . . .

[Counsel]: Who told them that they were being terminated?SUMs. Mennerick: I did. I told them *based on the information that was presented to me,* that I felt that they were not [ ] credible people, and that under those circumstances that they failed to respond to a patient that was in distress. That that was extremely against any of our policies, and that I didn't want them working there any longer.

(Emphasis added.) Prior to terminating Ms. Hider and Ms. White, Ms. Mennerick did not speak with Ms. Anderson, nor did she have knowledge of Ms. Anderson's conversation with

appellants in the hallway prior to their exit from the building.[11]

In response to a form titled "Request for Separation Information" from the Office of Unemployment Insurance of the DEED, Ms. Mennerick, in her capacity as Administrator of the Nursing Home, gave the following reason for Ms. White's and Ms. Hider's discharges:

> 10/6/94 Failed to respond to a request for assistance regarding patient's health status and during the situation left the building to get personal items from [ ] car. This resident was sent out 911 & resulted in a myocardial infarction.[12]

## STANDARD OF REVIEW

■ Our role in reviewing the decision of an administrative agency "is precisely the same as that of the circuit court." *Department of Health and Mental Hygiene v. Shrieves,* 100 Md.App. 283, 303–04, 641 A.2d 899 (1994). Like the circuit court, we must review the administrative decision itself. *Public Serv. Comm'n v. Baltimore Gas & Electric Co.,* 273 Md. 357, 362, 329 A.2d 691 (1974). Inasmuch as the Board adopted the Hearing Examiner's findings of fact and conclusions of law, we look to the Hearing Examiner's decision in order to determine whether the Board erred in concluding that appellants were discharged for misconduct, within the meaning of Labor and Employment section 8–1003.

■ The standard of review of unemployment insurance determinations is governed by *Labor and Employment section*

---

11. Ms. Mennerick testified that appellants did not explain to her that they had spoken to Ms. Anderson and given her instructions prior to their exit from the building. She stated that Ms. Hider told her that she had spoken with Ms. Anderson earlier in the morning. Later, on cross-examination, she stated: "I don't know exactly when that conversation took place. No one seems to know exactly when that happened."

12. The patient's records clearly show that the patient had pneumonia and did not suffer from a heart attack. On cross-examination, Ms. Mennerick admitted this.

8–512(d).[13] Under that standard, our review of the Board's decision is limited to determining: (1) whether the Board "applied the correct principles of law," *Department of Economic and Employment Dev. v. Taylor*, 108 Md.App. 250, 261, 671 A.2d 523 (1996), *aff'd*, 344 Md. 687, 690 A.2d 508 (per curiam); and (2) whether the Board's factual findings are supported by "substantial evidence." *United Parcel Serv. v. People's Counsel for Baltimore County*, 336 Md. 569, 577, 650 A.2d 226 (1994). The Board's decision is reviewed in the light most favorable to the Board, "since decisions of administrative agencies are prima facie correct and carry with them the presumption of validity." *Board of Education v. Paynter*, 303 Md. 22, 35–36, 491 A.2d 1186 (1985). We can, however, only affirm the Board's decision based on its findings and for the reasons presented. *Department of Economic Employment Dev. v. Propper*, 108 Md.App. 595, 607, 673 A.2d 713 (1996) (citing *United Parcel Serv.*, 336 Md. at 570, 650 A.2d 226).

■ "[F]indings of fact made by the Board are binding upon the reviewing court, if supported by substantial evidence in the record." *Board of Appeals, Dep't of Employment and Training v. Mayor and City Council of Baltimore*, 72 Md. App. 427, 431, 530 A.2d 763 (1987). The "substantial evidence" standard means that the scope of review is limited to determining "whether a reasoning mind reasonably could have reached the factual conclusion the agency reached." *Department of Economic and Employment Dev. v. Hager*, 96 Md. App. 362, 369, 625 A.2d 342 (1993) (quoting *Baltimore Lutheran High Sch. Ass'n v. Employment Sec. Admin.*, 302 Md. 649, 661–62, 490 A.2d 701 (1985)). In addition, it is the Board's exclusive province to resolve factual conflicts and draw inferences from the evidence. *Paynter*, 303 Md. at 36, 491 A.2d

---

**13.** Section 8–512(d) of the Labor and Employment Article states:
 *Scope of Review.*—In a judicial proceeding under this section, findings of fact of the Board of Appeals are conclusive and the jurisdiction of the court is confined to issues of law if:
 (1) findings of fact are supported by evidence that is competent, material, and substantial in view of the entire record; and
 (2) there is no fraud.

1186; *Taylor,* 108 Md.App. at 262, 671 A.2d 523. " 'The Court may not substitute its judgment on the question whether the inference drawn is the right one or whether a different inference would be better supported. The test is reasonableness, not rightness.' " *Snowden v. Mayor and City Council of Baltimore,* 224 Md. 443, 448, 168 A.2d 390 (1961) (citation omitted).

In contrast, our review of the Board's legal conclusions is much broader: When the issue before the agency is one of law, "no deference is appropriate and the reviewing court may substitute its judgment for that of the agency." *Liberty Nursing Ctr., Inc. v. Department of Health and Mental Hygiene,* 330 Md. 433, 443, 624 A.2d 941 (1993); *see Westinghouse Electric Corp. v. Callahan,* 105 Md.App. 25, 34, 658 A.2d 1112 (1995) (court may substitute its judgment on the law if agency's "factual findings supported by substantial evidence are susceptible of but one legal conclusion, and the agency does not so conclude"). Moreover, if there is an issue of statutory construction, "[s]uch an issue involves a question of law," and our review of the Board's interpretation of a statute is expansive. *Gray v. Anne Arundel County,* 73 Md.App. 301, 309, 533 A.2d 1325 (1987) (citing *Comptroller of the Treasury v. Mandel Re-election Comm.,* 280 Md. 575, 579, 374 A.2d 1130 (1977)).

Analysis of the first and second issues presented by appellants requires us to interpret section 8–1003 of the Labor and Employment Article and to apply well-settled principles of statutory construction. The cardinal rule of statutory interpretation is to ascertain and effectuate the legislative intent in enacting the statute. *Montgomery County v. Buckman,* 333 Md. 516, 523, 636 A.2d 448 (1994). The language of the statute itself is the primary source for determining the intention of the Legislature, *Gray,* 73 Md.App. at 309, 533 A.2d 1325, and we give that language its "natural and ordinary meaning." *Buckman,* 333 Md. at 523, 636 A.2d 448; *Harford County v. University of Md. Medical Sys. Corp.,* 318 Md. 525, 529, 569 A.2d 649 (1990). Absent a clear intent to the contrary, a statute must be read "so that no word, clause,

sentence or phrase is rendered surplusage, superfluous, meaningless, or nugatory." *Buckman,* 333 Md. at 523–24, 636 A.2d 448; *State v. 149 Slot Machines,* 310 Md. 356, 361, 529 A.2d 817 (1987). Moreover, we read "pertinent parts of the legislative language together, giving effect to all of those parts if we can, and rendering no part of the law surplusage." *Sinai Hosp. v. Department of Employment,* 309 Md. 28, 40, 522 A.2d 382 (1987).

■ In considering the statutory scheme as a whole, we also consider the Legislature's purpose in enacting the statute. *Taylor,* 108 Md.App. at 267, 671 A.2d 523. The Unemployment Insurance Law is a remedial statute "intended to prevent economic insecurity and to alleviate the consequences of involuntary unemployment and economic distress." *Allen v. Core Target City Youth Program,* 275 Md. 69, 75, 338 A.2d 237 (1975). Given the remedial nature of the Unemployment Insurance Law, the Court of Appeals has held that such laws are to "be read liberally in favor of eligibility," and "disqualification provisions are to be strictly construed." *Sinai Hosp.,* 309 Md. at 40, 522 A.2d 382.

## ANALYSIS

**I. Whether appellants were discharged from the Nursing Home for the same behavior that the Board found to be misconduct.**

■ Labor and Employment section 8–1003 states:

(a) *Grounds for disqualification.*—An individual who otherwise is eligible to receive benefits is disqualified from receiving benefits *if the Secretary finds that unemployment results from discharge* or suspension as a disciplinary measure *for behavior that the Secretary finds is misconduct* in connection with employment but that is not:

(1) aggravated misconduct, under § 8–1002.1 of this subtitle; or

(2) gross misconduct, under § 8–1002 of this subtitle.

(b) *Duration of disqualification.*—A disqualification under this section shall

(1) begin with the first week for which unemployment is caused by discharge or suspension for misconduct; and

(2) continue for a total of at least 5 but not more than 10 weeks, as determined by the Secretary, based on the seriousness of the misconduct.

(Emphasis added.) A plain reading of section 8–1003(a) dictates that to disqualify a claimant from receiving benefits, the Secretary is required to find that the employee was discharged "for behavior" that the Secretary "finds is misconduct in connection with employment." In other words, in order to deny unemployment insurance benefits, the Secretary must first focus on the misbehavior of the employee that the employer alleges justified the termination; if the Secretary finds that the employee was not guilty of *that* misbehavior or that *such* misbehavior does not constitute misconduct, denial of unemployment benefits is unwarranted. An employee may not be denied benefits based on some action or inaction, that does not constitute the employer's basis for the discharge. Any contrary reading of the statute would deny due process to unemployment insurance claimants. The most basic requirement of due process "in any adversary proceeding . . . is that the person proceeded against be given notice and an adequate opportunity to contest the claim against him." *Burns v. Mayor and City Council of Midland,* 247 Md. 548, 553, 234 A.2d 162 (1967). To allow the Board to find misconduct for reasons different from those alleged by the employer would deny an employee the opportunity to present adequately his or her claim for benefits before the Board. Aside from the issue of due process, any contrary reading of the statute would also thwart the principle that unemployment insurance statutes are to be liberally construed in favor of eligibility for benefits.

■ We agree with appellants that the Nursing Home fired them for "lying and not assisting the charge nurse with a patient after an alleged call in the multi-purpose room." This conclusion is supported by Ms. Mennerick's testimony, along

with the Nursing Home's statement in the form titled "Request for Separation Information." As previously mentioned, the Hearing Examiner did "not find as fact that either part[y] heard a page in that multi-purpose room." Rather, he concluded that *after having spoken with Ms. Anderson in the hallway,* appellants "used poor judgment" by failing to follow Ms. Anderson to check on the patient's condition. Inasmuch as the Nursing Home was unaware of the hallway conference at the time of discharge, appellants could not have been discharged for this behavior.

The Board erred as a matter of law when, based on different behavior from the behavior for which the Nursing Home discharged appellants, it found that appellants were "discharged for misconduct" connected with employment.

II. **Whether the Board erred as a matter of law by concluding that appellants' misjudgment amounted to misconduct within the meaning of Labor and Employment section 8–1003.**

█ Even if we were to find that the Nursing Home did terminate appellants for the same behavior as that found by the Hearing Examiner, the outcome of this case would be the same. Appellants argue that an employee's behavior must be "deliberate or intentional" in order to constitute misconduct within the meaning of section 8–1003. Failing to mention aggravated misconduct, the Nursing Home counters that the "[L]egislature provides for two distinct disciplinary findings—gross misconduct and simple misconduct," and that, quoting *Employment Sec. Bd. of Md. v. LeCates,* 218 Md. 202, 208, 145 A.2d 840 (1958), the Legislature "intended to distinguish between 'deliberate and wilful misconduct' and 'misconduct' of a lesser degree." [14]

---

14. Appellee's reliance on language from the Court of Appeals' opinion in *LeCates* is misplaced. In *LeCates,* a 1958 opinion, the Court of Appeals observed that by enacting Chapter 496 of the Acts of 1947, §§ 5(b) and (c), [portions of the Unemployment Insurance Law], the Legislature intended to distinguish between " 'deliberate and wilful misconduct' and 'misconduct' of a lesser degree." *LeCates,* 218 Md. at

To determine the meaning of "misconduct" in section 8–1003, we must first look at the statutory scheme as a whole. Under the Unemployment Insurance Law, an employee can be disqualified from receiving benefits for varying durations for, *inter alia*, three forms of misconduct: gross misconduct, aggravated misconduct, and misconduct. While "gross misconduct" and "aggravated misconduct" are technically defined in the statute, the term "misconduct" remains undefined. *Allen*, 275 Md. at 86, 338 A.2d 237.[15]

The term "misconduct" as used in the Statute, means a transgression of some established rule or policy of the employer, the commission of a forbidden act, a dereliction of duty, or a course of wrongful conduct committed by an

208, 145 A.2d 840. Since that opinion, numerous substantive changes were made to the statutory provisions pertaining to misconduct—including one amendment in which the word "wilful" was not even used to define "gross misconduct." The Court of Appeals' forty-year-old interpretation of statutory language that no longer exists is clearly inapplicable to our interpretation of the current statutory language of section 8–1003 of the Labor and Employment Article.

15. Section 8–1002(a) states that "gross misconduct":
(1) means conduct of an employee that is
(i) deliberate and willful disregard of standards of behavior that an employing unit rightfully expects and that shows gross indifference to the interests of the employing unit; or
(ii) repeated violations of employment rules that prove a regular and wanton disregard of the employee's obligations; and
(2) does not include:
(i) aggravated misconduct, as defined under § 8–1002.1 of this subtitle; or
(ii) other misconduct, as defined under § 8–1003 of this subtitle.
Section 8–1002.1(a) states that:
(1) ... "aggravated misconduct" means behavior committed with actual malice and deliberate disregard for the property, safety, or life of others that:
(i) affects the employer, fellow employees, subcontractors, invitees of the employer, members of the public, or the ultimate consumer of the employer's product or services; and
(ii) consists of either physical assault or property loss or damages so serious that the penalties of misconduct or gross misconduct are not sufficient.
(2) In this section, "aggravated misconduct" does not include:
(i) gross misconduct, as defined under § 8–1002 of this title; or
(ii) misconduct, as defined under § 8–1003 of this title.

employee, within the scope of his employment relationship, during hours of employment, or on the employer's premises.[16]

*Rogers v. Radio Shack*, 271 Md. 126, 132, 314 A.2d 113 (1974). In determining that appellants' misjudgment amounted to misconduct, the Hearing Examiner professed to use the definition of misconduct as set forth in *Rogers*. Appellants plainly were *not* discharged for transgression of some established rule of the employer, for the commission of a forbidden act, or for a course of wrongful conduct. Thus, under the *Rogers* definition, the only possible reason for the Hearing Examiner's decision is that, evidently, he believed that appellants were guilty of "dereliction of duty."

█ The question arises as to whether, under the *Rogers* definition of misconduct, dereliction must be intentional, and more broadly, whether the term "misconduct" has an implied intent element. Dereliction of duty is a term that has been generally "interpreted to mean a willful or fraudulent violation or neglect of any official duty, and not the mere failure to do one particular thing." 26A C.J.S. *Dereliction*, at 499 (1956). Thus, using this general interpretation, to find that an employee was guilty of a "dereliction of duty" would require a finding of intent.

In *Boynton Cab Co. v. Neubeck*, 237 Wis. 249, 296 N.W. 636, 640 (1941), the Wisconsin Supreme Court defined "misconduct" as:

[C]onduct evincing such willful or wanton disregard of an employer's interests as is found in deliberate violations or disregard of standards of behavior which the employer has the right to expect of his employee, or in carelessness or negligence of such degree or recurrence as to manifest equal culpability, wrongful intent or evil design, or to show an intentional and substantial disregard of the employer's

---

16. The Court set forth the definition of "misconduct" used by the Board of Appeals of the Employment Security Administration, "without undertaking to circumscribe or enlarge it." *Allen*, 275 Md. at 86, 338 A.2d 237.

interests or of the employee's duties and obligations to his employer. On the other hand, **mere inefficiency, unsatisfactory conduct, failure in good performance as the result of inability or incapacity, inadvertencies or ordinary negligence in isolated instances, or good-faith errors in judgment or discretion are not to be deemed 'misconduct' within the meaning of the statute.**[17]

(Emphasis added.) The Wisconsin Supreme Court's definition of misconduct has been cited with approval and/or adopted by courts in several jurisdictions. *See Hickenbottom v. District of Columbia Unemployment Compensation Bd.*, 273 A.2d 475, 477–78 (D.C.1971) (adopting *Boynton Cab* definition of misconduct as set forth in 48 Am.Jur. *Social Security, Unemployment Ins. & Retirement Fund* § 38 (1943)); *Wickey v. Appeal Bd. of Mich. Employment Sec. Comm'n*, 369 Mich. 487, 120 N.W.2d 181, 186 (1963) (following *Boynton Cab* definition); *In re Yaroch*, 333 N.W.2d 448, 449–50 (S.D.1983) (adopting *Boynton Cab* definition); *Eastex Packaging Co. v. Department of Indus., Labor & Human Rels.*, 89 Wis.2d 739, 279 N.W.2d 248, 253 (Wis.1979) (citing *Boynton Cab* with approval); *see also* 26 A.L.R.3d 1356, 1359 (1969 & Supp.1996) (citing cases applying *Boynton Cab* definition of misconduct "or definitions fundamentally identical"). Moreover, courts in other jurisdictions have held, under their own unemployment insurance statutes, that misconduct must be intentional, so that a mere error in judgment does not constitute misconduct. *See Perry v. Gaddy*, 48 Ark.App. 128, 891 S.W.2d 73, 74 (1995) (good faith errors in judgment or discretion are not considered misconduct unless of such degree or recurrence as to manifest culpability, wrongful intent, or evil design); *Colton v. District of Columbia Dep't of Employment Servs.*, 484 A.2d 550, 553

---

**17.** We note that the unemployment insurance statutes of Wisconsin and Maryland are not identical. In Maryland, an employee can be disqualified from receiving benefits for "misconduct" as well as for "gross misconduct" or "aggravated misconduct." Md.Code Ann., Labor & Emp. §§ 8–1002 to 8–1003 (Supp.1996). In contrast, Wisconsin only has a statutory disqualification for "misconduct." Wis.Stat. § 108.04(5) (1995). Neither Maryland nor Wisconsin, however, has a statutory definition for "misconduct." *Allen*, 275 Md. at 86, 338 A.2d 237; *Charette v. State*, 196 Wis.2d 956, 540 N.W.2d 239, 241–42 (1995).

(D.C.1984) (ordinary negligence or honest mistake in judgment not misconduct; high degree of negligence or intentional behavior required); *Gunther v. Florida Unemployment Appeals Comm'n,* 598 So.2d 243, 244 (Fla.Dist.Ct.App.1992) (bad judgment does not constitute misconduct); *Winklmeier v. Board of Review of the Dep't of Labor,* 115 Ill.App.3d 154, 70 Ill.Dec. 880, 881, 450 N.E.2d 353, 354 (1983) (misconduct requires deliberate act; it does not include "mere insufficiency, ordinary negligence or good faith errors in judgment"); *Banks v. Administrator of the Dep't of Employment Sec.,* 393 So.2d 696, 699 (La.1981) (misconduct requires "intentional wrongdoing"); *In re Watson,* 189 A.D.2d 1088, 592 N.Y.S.2d 893 (1993) ("[A]lthough negligence or bad judgment may be valid causes for discharging an employee, they do not necessarily disqualify the employee" from receiving benefits; poor judgment does not rise to level of misconduct.). Also instructive is the definition of misconduct set forth by *Black's Law Dictionary* 1150 (4th ed. 1968), which similarly contains an intent requirement:

> A transgression of some established and definite rule of action, a forbidden act, a dereliction from duty, unlawful behavior, *willful in character,* improper or wrong behavior; its synonyms are misdemeanor, misdeed, misbehavior, delinquency, impropriety, mismanagement, offense, but not negligence or carelessness. *Mandella v. Mariano,* 61 R.I. 163, 200 A. 478, 479.

(Emphasis added) (cited by the Court of Appeals in *Resetar v. State Board of Educ.,* 284 Md. 537, 562, 399 A.2d 225, *cert. denied,* 444 U.S. 838, 100 S.Ct. 74, 62 L.Ed.2d 49 (1979)); *see also* 58 C.J.S. *Misconduct,* at 818 (1948) ("Both in law and in ordinary speech, the term 'misconduct' usually implies an act done willfully with a wrong intention, and conveys the idea of intentional wrongdoing. The term implies ... a wrongful intention, and not a mere error of judgment....").

Inasmuch as the Unemployment Insurance Law must be "read liberally in favor of eligibility" and "disqualification provisions are to be strictly construed," we do not believe that

the Legislature intended that workers, who, like the claimants in this case, have contributed into the unemployment insurance fund for many years, would be denied benefits for a mere error of judgment. We agree with the definition of misconduct set forth in *Boynton Cab* and with the decisions in our sister states that have held that the term "misconduct" implies an act done wilfully with a wrongful intent.[18] We hold that in order for conduct to constitute "misconduct" under Labor and Employment section 8–1003, an employee's misbehavior must be intentional and that mere errors in judgment do not amount to misconduct within the meaning of the statute.

The Hearing Examiner specifically found that appellants' behavior was not intentional. He concluded that the two claimants merely used "poor judgment." The Board, in adopting the Hearing Examiner's findings, erred as a matter of law in concluding that appellants' misjudgment amounted to misconduct in connection with work within the meaning of Labor and Employment section 8–1003.

**III. Whether the circuit court erred by entering a judgment of $500 against appellants to reimburse the Nursing Home for certain attorney's fees.**

 Appellants and Appellee DLLR urge us to vacate the circuit court's assessment of attorney's fees against appellants. They contend that such an assessment of fees violates the dictates of Labor and Employment section 8–512(a)(3), which prohibits a court from charging fees of any kind to persons who make claims for unemployment insurance benefits. DEED also argues that the circuit court erred in assessing fees against appellants because the fees were incurred due

---

**18.** We point out that in following the reasoning of the court in *Boynton Cab* as well as the other jurisdictions cited, we have not tread on the definition of "gross misconduct" in Labor and Employment section 8–1002. Section 8–1002 requires two distinct elements for a finding of gross misconduct: deliberate and willful disregard of standards of behavior an employing unit rightfully expects *as well as* gross indifference to the interests of the employing unit. Md.Code Ann., Labor & Emp. § 8–1002 (Supp.1996).

to mistakes by the clerk's office and the judge's staff as well as the Nursing Home's "futile motion" to dismiss. In order to address this question, it is necessary to set forth some rather dull details.

A Motion for Special Admission of Out–of–State Attorney was filed, on May 25, 1995, by Karen Kiefer, attorney of record for appellants, requesting that Frank Hider, a Texas attorney, be admitted to the bar for the limited purpose of participating as co-counsel for appellants. Although the motion was granted on June 12, 1995, the clerk's office did not docket the order or list Mr. Hider as attorney of record until October 31, 1995.

Maryland Rule 7–207 requires a petitioner to file a memorandum within 30 days after the clerk sends notice of the filing of the record. On August 24, 1995, the clerk notified all attorneys of record, except Mr. Hider, that the record of the proceedings had been filed. On October 10, 1995, Mr. Hider wrote to Judge Heller requesting clarification of the briefing schedule he had been sent. He also complained that he had not received notice that the record had been filed. By letter dated October 30, 1995, Judge Heller responded:

First, there was an oversight on the part of the Clerk's Office in not notifying you of the filing. Apparently, the Clerk did not note the Order allowing your appearance. I have to assume that your co-counsel shares information with you that she receives.

Nevertheless, you will have until November 29, 1995 in which to file your Memorandum. . . . My understanding is that the Attorney General's Office has indicated that they have no objection to this. . . .

While the Attorney General's Office did not object to the extension, due to an oversight, Judge Heller's staff did not contact the Nursing Home to receive its input. By letter dated November 2, 1995, the Nursing Home objected to the "extension of time" granted to appellants to file their memorandum. The Nursing Home's counsel expressed his "utter outrage" that appellants, who were represented by local coun-

sel, had been allowed to miss a filing date without any sanctions. Moreover, he stated that the "failure to even ascertain our views is even more galling...."[19] The court scheduled a hearing on all open matters and, on November 20, 1995, the Nursing Home filed a motion to dismiss. It alleged that appellants failed to either file a timely memorandum pursuant to Maryland Rule 7–207(a) or to timely seek a filing extension.

At a hearing on December 8, 1995, the trial judge observed that although appellants technically were required to file a memorandum by September 24, 1995, as of October 30, 1995, when the court gave appellants a new filing date for their memorandum, the Nursing Home had not objected or filed a motion to dismiss. Judge Heller denied the motion to dismiss but entered a judgment of $500 against appellants to cover some of the Nursing Home's attorney's fees. The Court said:

> *I will treat this granting of the additional time as the equivalent of a continuance* ... and, *although it does not provide under* [ ] the rule of *7[–]207,* and [ ] *although 2[–]508* on a continuance is *not directly on point,* I'm going to adopt the provisions of the [e] section dealing with costs when the [ ] Court grants a continuance for a reason other than ... "legislative privilege." And I'm relying upon 2[–]508 and that portion of [s]ub-paragraph [a] that says: "[On] [m]otion of any party or on its own initiative, the [c]ourt may continue a trial, or other proceeding, as justice may require." And I'm going to look at that as the continuing [of] a proceeding, [ ] proceeding being [defined] under Maryland Rule 1[–]202[ (s) ], [as] any part of an[ ] action and, thus ... *I'm going to award in favor of North Arundel*

---

19. In a letter to the Nursing Home's counsel, dated November 13, 1995, the Assistant Attorney General handling this case correctly pointed out that Mr. Hider did not request "an extension of time" to file appellants' memorandum, and that Judge Heller did not refer to an "extension" when he informed Mr. Hider of the due date for the memorandum.

*Nursing & Convalescent Center against Barbara Hider and Virginia White,* costs ... of five hundred dollars....

(Emphasis added.)

Maryland Rule 2–508(a) permits a court, by motion or on its own initiative, to continue a trial or other proceeding as justice may require. When granting a continuance for any reason except legislative privilege, Maryland Rule 2–508(e) allows the court to assess costs and expenses occasioned by the continuance.

Judge Heller did not have the right to award attorney's fees as a sanction in this matter because no rule gave him that right. No sanctions were requested under Maryland Rule 1–341 and Maryland Rule 2–508 is plainly inapplicable. The extension of time for filing a memorandum is not equivalent to a "continuance" of a "trial or other proceeding" under Maryland Rule 2–508. Although the court, in an order dated December 14, 1995, changed the trial to a later date, the Nursing Home agreed to this continuance and did not incur any loss as a result of changing the trial date. Moreover, the assessment of attorney's fees against appellants runs afoul of the prohibition set forth in Labor and Employment section 8–512(a)(3), which prohibits a court from charging "an individual who claims benefits a fee in any proceeding under this title." This provision is consistent with the statute's general purpose of easing the economic insecurity of the unemployed.[20]

---

**20.** In section 8–102 of the Unemployment Insurance Law, the General Assembly set forth its legislative findings and policy:

(b) *Findings.*—The General Assembly finds that:

(1) economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of the State;

(2) involuntary unemployment is a subject of general interest and concern that requires appropriate action by the General Assembly to ... lighten its burden, which often falls with crushing force on the unemployed worker and the family of the unemployed worker;

(3) the achievement of security for society requires protection against involuntary unemployment, which is the greatest hazard of our economic lives; and

(4) security for society can be provided by ... the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment, maintaining the purchasing

JUDGMENTS REVERSED; CASE REMANDED TO THE CIRCUIT COURT WITH INSTRUCTIONS TO REMAND TO THE BOARD OF APPEALS FOR THE ENTRY OF AN ORDER IN FAVOR OF APPELLANTS; COSTS TO BE PAID BY APPELLEES.

power, and limiting the serious social consequences of poor relief assistance.