706 A.2d 1073

**DEPARTMENT OF LABOR, LICENSING AND REGULATION**

v.

**Barbara M. HIDER et al.**

**No. 63, Sept. Term, 1997.**

Court of Appeals of Maryland.

March 11, 1998.

72

Andrew D. Auerbach (J. Joseph Curran, Jr., Atty. Gen., Lynn M. Weiskittel, Asst. Atty. Gen., Norman R. Buchsbaum, Lynn K. Edwards, Law Offices of Norman R. Buchsbaum, on brief), Baltimore, for petitioner.

Frank C. Hider, Hider & Associates, P.C., Dallas, TX, Karen Kiefer, Scottsdale, PA, on brief, for respondents.

Argued before ELDRIDGE, RODOWSKY, CHASANOW, RAKER and WILNER, JJ., MARVIN H. SMITH, Judge (retired), Specially Assigned, and DALE R. CATHELL, Judge, Specially Assigned.

RODOWSKY, Judge.

This is an unemployment compensation case. The Board of Appeals (the Board), applying Maryland Code (1991, 1997 Cum.Supp.), § 8–1003 of the Labor and Employment Article, temporarily disqualified two claimants from receiving unemployment compensation insurance benefits based on a finding of misconduct.[1] In the judicial review process the Court of Special Appeals concluded that the Board had erred as a matter of law in two respects. *Hider v. Department of Labor,*

---

[1]. Unless otherwise indicated, all statutory references are to Md.Code (1991, 1997 Cum.Supp.), Labor and Employment Article.

The Board's decision in this case was rendered when the Board was part of the Department of Economic and Employment Development. A 1995 reorganization of the administration of unemployment insurance transferred the Board from the Department of Economic and Employment Development to the Department of Labor, Licensing and Regulation. *See* Chapter 120 of the Acts of 1995.

*Licensing & Regulation,* 115 Md.App. 258, 693 A.2d 17 (1997). First, the intermediate appellate court considered that the Board had found misconduct on a basis other than the basis on which the employer relied for terminating the claimants' employment. *Id.* at 276, 693 A.2d at 25. Second, the court concluded that § 8–1003 required intentional conduct. *Id.* at 281, 693 A.2d at 28. As explained below, we shall reinstate the decision of the Board.

The claimants, Barbara M. Hider (Hider) and Virginia L. White (White), were employed by North Arundel Nursing and Convalescent Center, Inc. (the Nursing Home). The Nursing Home terminated the employment of Hider and White on the day after an emergency situation arose involving a chronically ill, sixty-nine-year-old patient at the Nursing Home (the Patient). A claims examiner in the Office of Unemployment Insurance determined that Hider and White were not disqualified. The Nursing Home administratively appealed, and an evidentiary hearing was held before a hearing examiner of the Board.

The hearing examiner concluded that Hider and White were temporarily disqualified because they were "discharged for misconduct connected with the work within the meaning of [§ 8–1003]." The Board affirmed, adopting the findings of fact and conclusions of law of the hearing examiner. On the claimants' petition for judicial review, the Circuit Court for Anne Arundel County affirmed. That judgment was reversed by the Court of Special Appeals. *Hider, supra.*

This Court then granted the petition for certiorari of the Department of Labor, Licensing and Regulation (the Department) that raises two questions:

"1. Did the lower court err by failing to apply the substantial evidence test to the Board's factual finding that claimants were discharged from their employment for failing to respond to an emergency situation?

"2. Did the lower court err by interpreting the simple 'misconduct' provision in the unemployment insurance law to apply only to purposeful misbehavior?"

Before the hearing examiner five witnesses testified for the employer and five for the claimants, compiling an agency record of testimony and exhibits comprising 917 pages. The overview of this record is that the Patient lived in a part of the Nursing Home designated as Station Two Back. On October 6, 1994, the day of the events giving rise to this case, Robin Anderson (Anderson), a licensed practical nurse (LPN), was assigned to Station Two Back and was immediately in charge of the Patient. White, an LPN and a nursing supervisor, was that day responsible for Station Two Back and for two other nursing stations. Hider, a registered nurse, was the Assistant Director of Nursing. Hider had been employed by the Nursing Home from November 1989, and White had been employed there from August 1992.

Employer's witnesses, Activities Director Sandra Osborne (Osborne), Assessment Nurse Melinda Miller (Miller), and Food Services Supervisor Lorraine Hill, testified that at approximately 12:30 p.m. on October 6, 1994, a page was broadcast into the multi-purpose room where they, along with Hider, were working on resident care plans. White, who was also in the room on a break, answered the page on the telephone in the multi-purpose room and, after hanging up, turned to those gathered in the room and asked if they had ever heard the Patient complain of his heart hurting. Miller responded that she had not and that such a complaint warranted further investigation. Hider then asked White to help her retrieve supplies from Hider's car for a bridal shower that was to be held in the Nursing Home later that same day. According to Osborne, White replied, " '[W]e'll get the food out of the car, and then we'll dial 911 when we get back.' " Hider and White left the multi-purpose room, laughing, and exited the building.

Concerned for the well-being of the Patient, Miller left the multi-purpose room to check on him. When she arrived at the Patient's room, she found him to have an elevated pulse, to be diaphoretic (*i.e.*, sweating profusely), and to be stating repeatedly, "My heart hurts." After consulting with Director of

Nursing Marcy Eley (Eley), Miller called 911, and the Patient was transferred by ambulance to North Arundel Hospital.

Before the hearing examiner, Hider and White denied that a page ever came into the multi-purpose room regarding the Patient's condition. They stated that the first time the Patient's status was brought to their attention was in the hallway as they were about to exit the building. There Anderson, the charge nurse, approached Hider and White to give them an update of the Patient's condition. Hider and White both testified that Anderson did not ask them for assistance or convey to them in any way that the Patient was in distress. They said that Anderson simply wanted to make them aware that she had medicated the Patient for agitation in accordance with a physician's instructions. Hider testified that she asked Anderson what the Patient's vital signs were and, when Anderson replied that she had not taken them, both Hider and White instructed her to return to the Patient's room and take his vital signs. Hider and White then left the building and returned in approximately five minutes to discover that 911 had been called for the Patient.

Anderson, called as a witness by the claimants, testified that when she approached Hider and White in the hallway she told them that she thought the Patient should be sent to an acute care hospital via 911 because he was complaining of chest pains. Although she did not use the word, "emergency," when referring to the Patient's condition, Anderson testified that she conveyed to Hider and White her opinion that it was indeed an emergency and that the Patient should be evaluated at an acute care hospital. Anderson testified that Hider and White instructed her to return to the Patient's room and take his vital signs. Anderson said that White appeared to be confused when Anderson spoke to the latter in the hall and that it later occurred to Anderson that White may not have been the person who responded to the page.

On October 7, 1994, following a brief fact-finding investigation, the Nursing Home's Administrator, Sandra Mennerick (Mennerick), and Director of Nursing Eley, met with Hider

and White to discuss what had transpired the preceding day. The meeting ended with the termination of Hider and White.

In findings of fact adopted by the Board, the hearing examiner did not credit the testimony of the Nursing Home's witnesses regarding a page responded to by White in the multi-purpose room. The hearing examiner did, however, find that Anderson had approached Hider and White in the hallway, had conveyed to them her concern that the Patient's condition constituted an emergency, and that Hider and White, "apparently [misunderstanding] the gravity of the situation," failed to assist Anderson with the Patient.

In an evaluation of the evidence that was also adopted by the Board, the hearing examiner stated:

"[T]he employer has failed to show an intentional, wanton disregard of the rights that the employer can expect. The claimant[s] used poor judgment in failing to follow Ms. Anderson to check the specific patient prior to running a brief personal errand. This Hearing Examiner will hold that the claimants['] misjudgment in this particular case amounts to misconduct. The purpose of a nursing home is for quality care and service to patients."

The claimants were denied benefits for the week beginning October 2, 1994, and for the nine weeks immediately following.

■■■■ The scope of judicial review of a determination by the Board in an unemployment compensation insurance case is set forth in § 8–512(d):

"*Scope of review.*—In a judicial proceeding under this section, findings of fact of the Board of Appeals are conclusive and the jurisdiction of the court is confined to questions of law if:

(1) findings of fact are supported by evidence that is competent, material, and substantial in view of the entire record; and

(2) there is no fraud."

Under this statute, the reviewing court shall determine only: "(1) the legality of the decision and (2) whether there was

substantial evidence from the record as a whole to support the decision." *Baltimore Lutheran High Sch. Ass'n v. Employment Sec. Admin.*, 302 Md. 649, 662, 490 A.2d 701, 708 (1985). The reviewing court may not reject a decision of the Board supported by substantial evidence unless that decision is wrong as a matter of law. *See Department of Econ. & Employment Dev. v. Propper*, 108 Md.App. 595, 604, 673 A.2d 713, 717 (1996). The test for determining whether the Board's findings of fact are supported by substantial evidence is whether reasoning minds could reach the same conclusion from the facts relied upon by the Board. *See Baltimore Lutheran*, 302 Md. at 661–62, 490 A.2d at 708.

The decision of this case is governed by § 8–1003, which provides:

"(a) *Grounds for disqualification.*—An individual who otherwise is eligible to receive benefits is disqualified from receiving benefits if the Secretary finds that unemployment results from discharge or suspension as a disciplinary measure for behavior that the Secretary finds is misconduct in connection with employment but that is not:

(1) aggravated misconduct, under § 8–1002.1 of this subtitle; or

(2) gross misconduct under § 8–1002 of this subtitle.

(b) *Duration of disqualification.*—A disqualification under this section shall:

(1) begin with the first week for which unemployment is caused by discharge or suspension for misconduct; and

(2) continue for a total of at least 5 but not more than 10 weeks, as determined by the Secretary, based on the seriousness of the misconduct."

## I

The Department does not dispute that, for misconduct to be disqualifying under this statute, the behavior that the Secretary finds to be misconduct must be the same behavior that the Secretary finds to be the reason for the discharge. That is, the basis for the discharge and the basis for a finding of

misconduct must be one and the same, as determined by the Secretary.

In the instant matter, when Mennerick terminated the claimants' employment, she acted in the belief that the claimants were made aware of the Patient's distress in the response by telephone to the overhead page heard in the multi-purpose room. The claimants contend that, because the Board relied on Anderson's hallway conversation with the claimants as furnishing them notice of the Patient's distress, the Board relied on misconduct different from the misconduct that resulted in termination of employment. The variation in evidentiary detail, however, does not alter the substance of the misconduct.

In the instant case, the Board found that "[t]he claimants were terminated by the employer on or about October 7, 1994, for failing to respond to an emergency situation" involving the Patient. The Board further concluded that this behavior constituted misconduct under § 8–1003. The basis for the discharge and the basis for a finding of misconduct being one and the same, *i.e.*, the claimants' failure to respond to a medical emergency, the Board disqualified them from receiving unemployment insurance benefits for a ten-week period.

■ There was substantial evidence from which the Board could reasonably have determined that the claimants were terminated for their failure to respond to an emergency medical situation. We base this holding on the following facts.

Mennerick, the Administrator of the Nursing Home, testified to what she told Hider and White on October 7, 1994, regarding the reason for their termination:

"I told them based on the information that was presented to me, that I felt that they were not the credible people, and that under those circumstances that they failed to respond to a patient that was in distress. That that was extremely against any of our policies, and that I didn't want them working there any longer."

Eley, the Director of Nursing, corroborated Mennerick's testimony, stating that Mennerick said the following to Hider and White at the October 7 meeting:

"That when two of our more responsible charge nurses and people who are supposed to be our top nurses would leave the building when someone is in distress, having cardiac distress, and they were to leave the building at that point, rather than taking care of them, that this is not an appropriate action, and it is not something that we can tolerate at our facility. Our standard of nursing, our standing [sic] of what we want to administer to our residents, the type of care we give, is more than that. And that if this were true, then we could not keep them on our staff."

Hider's understanding of why she was discharged lends further support to the view that Hider and White were discharged for "fail[ing] to respond to a patient that was in distress." Answering a question on direct examination as to her understanding of the reason for her termination, Hider stated:

"My understanding was the fact that I had no knowledge of a patient being in distress.... [T]he statement that I had made that I did not have that knowledge was ignored, [and] they said I knew when I walked out of the building."

The following colloquy which took place before the hearing examiner is also relevant in determining the reason for Hider and White's termination:

"[Counsel for Hider]: The question is, if Ginny White was on station two within five minutes of the time Ms. Miller left the multi-purpose room, walked down to station two, checked the patient, assessed him, got you to assess him and called 911, would that be a reasonable response for a unit supervisor in this situation?

"Ms. Eley: If she hadn't gone outside the building and left the building before that time interval took place. This whole thing is based upon leaving the building after receiving a call for help."

Further, the employer's written response, signed by Mennerick, on the unemployment insurance agency's form requesting information concerning White's separation from employment stated:

"On 10/6/94 failed to respond to a request for assistance regarding patient's health status and during the situation left the building to get personal items from her car. The resident was sent out 911 & resulted in a myocardial infarction." [2]

The response on the form questionnaire with respect to Hider was similar.[3]

There was substantial evidence that the claimants were terminated for their failure to respond to an emergency medical situation.[4]

---

**2.** On October 6, 1994, the Patient was admitted to the cardiac unit of North Arundel Hospital to rule out any cardiac event. On October 8, 1994, it was determined that the Patient had not had a myocardial infarction, and, consequently, he was transferred to a regular medical floor of the hospital. On October 20, 1994, the Patient was discharged from North Arundel Hospital and transferred back to the Nursing Home. The hospital record completed at the time of the Patient's discharge indicated that he had been admitted as a result of bilateral pneumonia and not as a result of having suffered a myocardial infarction. In her testimony before the hearing examiner, Mennerick stated that, at the time she responded to the request for separation information, she had not read the transfer summary and believed the Patient to have suffered a myocardial infarction.

**3.** The precise wording on Hider's report is as follows:

"10/6/94   Failed to respond to a request for assistance regarding patient's health status and during the situation left the building to get personal items from the car. This resident was sent out 911 & resulted in a myocardial infarction."

**4.** The Court of Special Appeals rejected the Board's finding that Hider and White were terminated for failing to respond to a medical emergency and concluded instead that, "the Nursing Home fired them for 'lying and not assisting the charge nurse with a patient after an alleged call in the multi-purpose room.'" *Hider*, 115 Md.App. at 275, 693 A.2d at 25. Assuming that there was evidence to support such a conclusion, the inquiry of the reviewing court is whether there is substantial evidence to support the Board's factual findings. It is exclusively the province of the Board to resolve conflicting evidence, and, where inconsistent inferences can be drawn from the same evidence, it is exclusively the

## II

The Court of Special Appeals alternatively held that the Board's decision was wrong as a matter of law because claimants' behavior did not constitute misconduct under § 8–1003.

Rejecting the Board's conclusion that claimants' use of "poor judgment" in failing to respond to a medical emergency constituted misconduct under § 8–1003, the Court of Special Appeals stated:

> "We agree [with the decisions of other jurisdictions] that the term 'misconduct' implies an act done wilfully with a wrongful intent. *We hold that in order for conduct to constitute 'misconduct' under [§ 8–1003], an employee's misbehavior must be intentional* and that mere errors in judgment do not amount to misconduct within the meaning of the statute."

*Hider*, 115 Md.App. at 281, 693 A.2d at 28 (footnote omitted; emphasis added). Construing § 8–1003 in the context of the statutory scheme in which it was enacted compels a different conclusion.

In enacting the unemployment compensation program, the legislature created a graduated, three-tiered system of disqualifications from benefits based on employee misconduct. The severity of the disqualification increases in proportion to the seriousness of the misconduct. A finding of misconduct pursuant to § 8–1003 results in a claimant's being disqualified from receiving unemployment benefits for a period of five to ten weeks. The term, "misconduct," as it is used in § 8–1003, is undefined in that section. *See Allen v. Core Target City Youth Program,* 275 Md. 69, 86, 338 A.2d 237, 247 (1975). Section 8–1002 provides that a claimant who is discharged as a result of "gross misconduct" is disqualified from receiving unemployment benefits until the claimant is reemployed and has earned wages equal to at least twenty times the claimant's

province of the Board to draw the inference. *See Baltimore Lutheran,* 302 Md. at 663, 490 A.2d at 709.

weekly unemployment benefit amount.[5]  Only misconduct that is "deliberate and willful" or misconduct that is "wanton" can qualify as "gross misconduct."  A finding of "aggravated misconduct" under § 8–1002.1 causes a claimant to be disqualified from receiving unemployment benefits until the claimant is reemployed and has earned wages equal to at least thirty times the claimant's weekly unemployment benefit amount.[6]

---

**5.**  Section 8–1002 provides:

"(a) *'Gross misconduct' defined.*—In this section 'gross misconduct':
(1) means conduct of an employee that is:
(i) deliberate and willful disregard of standards of behavior that an employing unit rightfully expects and that shows gross indifference to the interests of the employing unit;  or
(ii) repeated violations of employment rules that prove a regular and wanton disregard of the employee's obligations;  and
(2) does not include:
(i) aggravated misconduct, as defined under § 8–1002.1 of this subtitle;  or
(ii) other misconduct, as defined under § 8–1003 of this subtitle.
(b) *Grounds for disqualification.*—An individual who otherwise is eligible to receive benefits is disqualified from receiving benefits if unemployment results from discharge or suspension as a disciplinary measure for behavior that the Secretary finds is gross misconduct in connection with employment.
(c) *Duration of disqualification.*—A disqualification under this section shall:
(1) begin with the first week for which unemployment is caused by discharge or suspension for gross misconduct as determined under this section;  and
(2) continue until the individual is reemployed and has earned wages in covered employment that equal at least 20 times the weekly benefit amount of the individual."

**6.**  Section 8–1002.1 provides:

"(a) *'Aggravated misconduct' defined.*—(1)  In this section, 'aggravated misconduct' means behavior committed with actual malice and deliberate disregard for the property, safety, or life of others that:
(i) affects the employer, fellow employees, subcontractors, invitees of the employer, members of the public, or the ultimate consumer of the employer's product or services;  and
(ii) consists of either physical assault or property loss or damage so serious that the penalties of misconduct or gross misconduct are not sufficient.
(2) In this section, 'aggravated misconduct' does not include:
(i) gross misconduct, as defined under § 8–1002 of this title;  or
(ii) misconduct, as defined under § 8–1003 of this title.

84

"Actual malice" is required for a finding of "aggravated misconduct."

■ Construing § 8–1003 to require intentional misbehavior would blur, if not dissolve, the distinction between the misconduct provision of § 8–1003 and the gross misconduct provision of § 8–1002. A finding of § 8–1003 misconduct under the construction applied by the Court of Special Appeals would be tantamount to a finding of gross misconduct under § 8–1002(a)(1)(i), which requires misbehavior that is "deliberate and willful." Furthermore, a finding of "wanton" misbehavior, sufficient to support a finding of gross misconduct under § 8–1002(a)(1)(ii) would be, absent intent, insufficient to support a finding of simple misconduct under § 8–1003, notwithstanding the fact that the penalty imposed for gross misconduct is more severe than that imposed for simple misconduct. Such a construction would clearly upset the carefully crafted statutory framework of the Unemployment Insurance Law. Therefore, the Court of Special Appeals erred in construing the misconduct provision of § 8–1003 to require intentional misbehavior.

The Court of Special Appeals placed considerable reliance on a 1941 Wisconsin case, *Boynton Cab Co. v. Neubeck,* 237 Wis. 249, 296 N.W. 636 (1941), for the proposition that § 8–1003 requires intentional misbehavior. The statute at issue in that case imposed an absolute disqualification from unemployment benefits if the employee was discharged for misconduct.

(b) *Grounds for disqualification.*—An individual who otherwise is eligible to receive benefits is disqualified from receiving benefits if unemployment results from discharge or suspension as a disciplinary measure for behavior that the Secretary finds is aggravated misconduct in connection with employment.

(c) *Duration of disqualification.*—A disqualification under this section shall:

(1) begin with the first week for which unemployment is caused by discharge or suspension for aggravated misconduct as determined under this section; and

(2) continue until the individual is reemployed and has earned wages in covered employment that equal at least 30 times the weekly benefit amount of the individual."

*Boynton Cab,* 296 N.W. at 638. Thus, the statute in *Boynton Cab* is more analogous to §§ 8–1002 and 8–1002.1 than it is to § 8–1003.

In *Rogers v. Radio Shack,* 271 Md. 126, 314 A.2d 113 (1974), this Court adopted the following as a "reasonable" definition of "misconduct" as that term was used in the predecessor to § 8–1003:

> " 'The term, "misconduct," as used in the Statute, means a transgression of some established rule or policy of the employer, the commission of a forbidden act, a dereliction of duty, or a course of wrongful conduct committed by an employee, within the scope of his employment relationship, during hours of employment, or on the employer's premises.' "

*Id.* at 132, 314 A.2d at 117. In the context of unemployment insurance benefits, " '[t]he "wrongness" of the conduct must be judged in the particular employment context.' " *Employment Sec. Bd. v. LeCates,* 218 Md. 202, 208, 145 A.2d 840, 844 (1958) (quoting P.H. Sanders, *Disqualification for Unemployment Insurance,* 8 Vand. L.Rev. 307, 334 (1955)).

Noting that, "a nursing home is for quality care and service to patients," the Board concluded that claimants' use of "poor judgment" in failing to respond to an emergency situation satisfied the *Rogers* definition of misconduct. There was substantial evidence from which the Board could reasonably have concluded that claimants were derelict in their duty.

The hearing examiner was entitled to credit the testimony that the claimants did indeed receive a request for assistance from a nurse concerned about a patient in distress, that the claimants did not respond to this request, and that they instead left the Nursing Home building on a personal errand. The hearing examiner was similarly entitled to credit the testimony of Director of Nursing Eley, that, "if a nurse calls for help in assessing one of their residents because of any significant change in [the resident's] condition, they should go immediately and offer assistance to that nurse." Failure to do

so, testified Administrator Mennerick, "was extremely against any of [the Nursing Home's] policies."

For the foregoing reasons, we reverse.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT FOR THE ENTRY OF A JUDGMENT AFFIRMING THE JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY. EACH PARTY SHALL BEAR THEIR OWN COSTS.**