MARCEL LEMELIN *v.* ADMINISTRATOR, UNEMPLOYMENT COMPENSATION ACT, ET AL.

SUPERIOR COURT     NEW HAVEN COUNTY     FILE No. 113511
AT NEW HAVEN

Memorandum filed February 16, 1968

*Bernard Insler,* of New Haven, for the plaintiff.

*Robert K. Killian,* attorney general, and *Carl D. Eisenman,* assistant attorney general, for the named defendant.

*Ritter, Berman & Sussler,* of Norwich, for the defendant Keystone Masonry, Inc.

PASTORE, J. This is an appeal by an employer, Keystone Masonry, Inc., of Chester, Connecticut, from a decision of the unemployment compensation commissioner affirming the finding of the administrator that the plaintiff was entitled to unemployment compensation benefits. The finding of the commissioner shows that the plaintiff is forty-five years old; that he is a member of a union who normally receives a union wage of $5 an hour; that he worked for Keystone almost two months in October to December, 1966, and, not being able to find union work, returned to work with Keystone from January 25, 1967, to February 16, 1967, receiving nonunion wages of $4.50 per hour; that Keystone was nonunion; that on February 16, 1967, the union

business agent, seeing the plaintiff on the job, told him to finish the day but not to continue on the non-union job; that the plaintiff got through at the close of the day on February 16, 1967, "as he did not want to lose his union status"; that the unemployment compensation department policy provides that a nonunion job is not suitable for a union man and the plaintiff had no choice but to leave Keystone's employment; that he left for sufficient cause; and that he was entitled to benefits.

The appeal of Keystone thereafter taken alleges that the commissioner erred in granting the plaintiff compensation because the plaintiff voluntarily refused to work for Keystone when work was available to him, that as a result he was disqualified for benefits under the provisions of § 31-236 (1) of the General Statutes, and that the decision of the commissioner affirming the administrator was unreasonable and arbitrary in that (a) the plaintiff was offered suitable work on February 16, 1967, by Keystone, and employment has been available to him thereafter; (b) he was not ready, willing and able to accept suitable employment; and (c) the evidence deduced at the hearing did not support the commissioner's opinion. Keystone prays judgment affirming the appeal and a reversal of the commissioner's decision.

Keystone questions the sufficiency of the evidence deduced at the hearing of April 24, 1967, in support of the finding of the commissioner. The transcript shows in part that the union business agent, Danaher, told the plaintiff that if he "wouldn't get off [the nonunion job] . . . he would be fined $150." The transcript also shows that it was stated by A. Koury, examiner for the unemployment compensation department, for the administrator, that because the plaintiff was a "union member in good

standing . . . he had no choice but to quit the job once he was told to do so by his union business agent." The record further shows that on March 7, 1967, the unemployment office received information from the office of Keystone that the "union official approached claimant and told claimant that unless he quits he will lose his union membership, so claimant quit."

The finding of the commissioner that on February 16, 1967, the plaintiff got through with his work with the Keystone as he "did not want to lose his union status" is sufficiently broad to cover the imposition of a union fine although suggestive of expulsion, although it does not find in what way the union status of the plaintiff would be affected for any breach of union rules or of an order of the union's business agent. A claim of Keystone is that the threat of a fine or other discipline was not shown to be based in any union rules and could have been merely a personal opinion of the union business agent. Since no point was made at the hearing before the commissioner that the plaintiff could not have been subject to a fine or other discipline in the circumstances in question under the union rules, the contrary will not be assumed here under the circumstances. In all events, if the union rules did not provide for the threatened union discipline, the threat of the union business agent would hold out even less "sufficient cause" for a refusal by the plaintiff to continue with or to accept otherwise suitable employment with Keystone.

The parties are not in dispute that except for the nonunion character of Keystone's shop, the work with Keystone was suitable and that there were no conditions or requisites of being employed relating to unions or otherwise attached to the employment by Keystone. Cf. General Statutes § 31-236 (1) (c).

A motion of Keystone filed May 17, 1967, to correct the finding of facts in several respects was denied by the commissioner on May 22, 1967. A paragraph of the motion requests the addition of a finding stating in effect that on February 16, 1967, and during working hours thereafter, employment was available to the plaintiff with Keystone. Whether this addition to the finding is necessary to a consideration of the merits of the appeal is questionable at best. Quitting an existing job which has been continuing, without more, under the circumstances of this case necessarily implies a refusal to accept the work being offered. Moreover, in view of (a). the facts found by the commissioner, (b) the statement of the union business agent to the plaintiff that he "had no business working for this nonunion employer," and the statement of the agent that he told the plaintiff "if he wouldn't get off he would be fined," (c) the statement of Keystone's office manager that the "union official approached claimant and told claimant unless he quits he will lose his union employment," (d) the statement of Koury, examiner, unemployment compensation department, for the administrator, to the effect that since the plaintiff was a "union member in good standing . . . he had no other choice but to quit the job once he was told to do so by his union business agent," and (e) the record's being devoid of any mention of the unavailability or termination of the job with Keystone, it is a reasonable inference and a fact not in dispute that the job with Keystone was available to the plaintiff on February 16, 1967, and continued available to him thereafter during working hours. The denial by the commissioner of an amendment to the finding to this effect is error, and the motion of Keystone to this effect should have been granted. The finding of the commissioner as thus amended will be considered.

The question whether conclusion of the commissioner that the plaintiff is entitled to benefits was correct is one of law involving the interpretation of the pertinent statutes. The issue here presented by the parties is whether a member of a labor organization who quits his work with a nonunion employer and refuses to continue on the job on the sole ground that its acceptance and continuance would jeopardize his union status (a) is "available" within the meaning of the eligibility conditions of General Statutes § 31-235 (2), and (b) failed "without sufficient cause . . . to accept suitable work when offered him . . . by an employer," within the meaning of a disqualification condition as to benefits under General Statutes § 31-236 (1).

Keystone urges that the plaintiff is not eligible for compensation benefits because he was not available for work. A decisive question is whether his failure to accept the work with Keystone was "without sufficient cause," within the meaning of § 31-236 (1). The essence of the plaintiff's reason for the refusal of further work was the threat of union discipline, at least by way of a fine.

I

In *Chambers* v. *Owens-Ames-Kimball Co.,* 146 Ohio 559, 564–67 (1946), presenting a similar factual situation under an essentially similar provision of the statutes, the court stated: "[T]he interpretation of appellee would make the operative effect of a refusal to work depend entirely upon the whim or caprice of an organization to which the applicant for unemployment compensation might belong. It is within the range of possibility that a labor organization might adopt a rule that no member could work where negroes are employed, or where the employment calls for more than four hours as a day's work, or where the place of busi-

ness of an employer is more than a mile from the residence of the unemployed member, or where an employer fails to maintain certain facilities relating to the conditions of employment, even though not required by law so to do, or where an employer does not pay a wage equal to the union wage for the same kind of work. Under such an interpretation, the right of the applicant for unemployment compensation would not be fixed or determined by the provisions of the statute but by rules adopted by organizations in which the applicant has membership. Such interpretation of the statute, and as a consequence its administration in conformity to such interpretation, is clearly untenable. . . . Under appellee's interpretation of the statute, an unemployed nonunion workman would be obliged to accept the same job which the appellee refused to accept and would be required to work without right to participate in the unemployment compensation benefits. . . . It would result in discrimination and injustice. The law must do justice. There can be no valid classification of persons based upon membership or nonmembership in a labor organization, which would operate to differentiate rights to receive benefits under the unemployment compensation statute." See *Thornbrough* v. *Stewart*, 232 Ark. 53, 55 (1960). Section 31-236 (1) (a), (b), and (c) are three saving clauses preventing disqualification for benefits. Although subsection (c) touches the matter of unions, *its provisions do not save a disqualification under the facts of the present case.* An intent to do so could have readily been expressed by the legislature. See *Chambers,* supra, 565.

## II

If the plaintiff's interpretation of the statute were followed, it would mean that an unemployed

nonunion worker refusing a nonunion job otherwise suitable would not be entitled to benefits, whereas a union worker refusing the same job, otherwise suitable, would be entitled to them.

In *Barclay White Co.* v. *Unemployment Compensation Board of Review,* 356 Pa. 43, 51 (1947), involving a question similar to the one in the instant case, the court stated: " 'A cause which offends against public policy . . . is not a good cause. I am convinced that claimant's excuse for not accepting the referred work, even if he made himself liable thereby to expulsion from his union, is within that class. This is a statute enacted for the common good in an attempt to provide economic security for a time, through referred jobs in productive industry for the unemployed, without the stigma of poor relief, as a substitute for the dole or made-work. Its purpose is to prevent indigence due to involuntary unemployment through no fault of the employee. And while the legislature indicated a sympathetic and proper respect for labor organizations, the purpose of the act was not to further their objectives as such. The act stands impartial between organized labor and industry, in the evolution of their relations one with the other, with a studied policy of non-interference except in definite provisions which insure the right of a workman to maintain his membership in the union of his choice. What the act prohibits is a condition attached to referred employment that a workman join a company union or resign from or refrain from joining any other labor organization. The prohibitions, by implication, relate to conditions imposed by the new employer or by the referring agency. . . . [I]t is clear that the exceptions cannot be extended to apply to a workman who may lose his existing membership under a union by-law merely because of temporary work in a non-union shop while employ-

ment in a union shop of his affiliation is not available. To hold otherwise is the equivalent of saying that a union may adopt its own definition of suitable work and determine, by rule and by-law, what does and what does not constitute *good cause* for refusing referred employment. The legislature has not delegated such authority and is without power to do so.'"

In *Chambers,* supra, 569, it was stated: "The right of the claimant must not depend upon union or nonunion status. Where the provisions of a statute and a rule of a private organization to which an applicant for unemployment compensation belongs, both affecting the qualification of such applicant to receive benefits, come in conflict as they do in this case, . . . [u]nquestionably, the statute under which the compensation benefits are authorized and made available must prevail." See 81 C.J.S., Social Security and Public Welfare, § 200, p. 296 nn.65 & 66.

It is difficult for this court to find such a legislative intent in support of the plaintiff's interpretation of §§ 31-235 and 31-236 (1) as would result in so favoring the interest of a member of a labor union over that of a nonunion worker, or in constituting it "sufficient cause," for a worker to refuse acceptance of suitable work, that he had voluntarily entered into some contract outside of his employment which he may have deemed financially advantageous, even though the contract involves a membership in a trade union which may be jeopardized by acceptance of the employment, or permits other union discipline to be provoked. Especially is this so when those sections of the General Statutes are part of a public act intended to apply to all persons coming within its purpose and operation. No such legislative intent as urged by the plaintiff is ex-

pressed or implied with regard to unemployment benefits in those sections of the statute. See *Chambers,* supra, 565; *Barclay White Co.,* supra, 47.

### III

The policy of the unemployment compensation department providing that "a nonunion job is unsuitable for a union man" is untenable. It aids and discriminates in favor of the allowance, to claimants who are members of a labor organization, of unemployment benefits otherwise denied to a nonunion member under similar circumstances. *Chambers,* supra, 567; see *Beckert* v. *Administrator,* 20 Conn. Sup. 9. It tends to restrict the labor market for otherwise suitable work and to prevent employment even during temporary periods when a union worker is not able to find union work, and hence to foster unemployment contra to an objective of the Unemployment Compensation Act. *Leclerc* v. *Administrator,* 137 Conn. 438, 440; *Chambers,* supra, 570; *Barclay White Co.,* supra, 48. As a "policy" of the department, it has less legal standing than would even a formal regulation of the department; cf. General Statutes § 31-250; and in all events cannot act to amend a state statute to effectuate a purpose not therein expressly or impliedly stated. Compare § 31-236 (1) (meaning of suitable work) and § 31-236 (1) (c) as to enumeration of factors of suitable new work. *Barclay White Co.,* supra, 47; cf. *Thornbrough* v. *Stewart,* 232 Ark. 53, 54. Moreover, the record fails to show that the work made available by Keystone to the plaintiff was unsuited in any factual respect, within the terms of § 31-236 (1), apart from its nonunion character.

Under the circumstances of this case, the policy of the department declaring nonunion work unsuitable for a union worker is discriminatory, against

public policy, contrary to a purpose of the Unemployment Compensation Act, arbitrary, unreasonable and in abuse of discretion as it applies to the instant case and may not by fiat transform otherwise suitable work into unsuitable labor.

## IV

Section 31-235 (2) of the General Statutes provides that to be eligible to receive benefits an unemployed person must be, among other stated conditions, "available for work." In *Leclerc* v. *Administrator,* 137 Conn. 438, 439–41, it was stated: "To be available for work within the meaning of the statute, one must be ready, able and willing to accept suitable employment. He must be exposed unequivocally to the labor market. . . . [The] purpose and intent [of the Unemployment Compensation Act] was to relieve the hardship of involuntary unemployment caused by the failure of industry to provide stable employment. . . . [A] claimant who limits his availability for work because of personal reasons unrelated to the employment is not entitled to compensation."

In *Barclay White Co.,* supra, 50, it was held that when a union member is unemployed because he refuses to accept work at a rate less than that established by the union, although not less than the prevailing wage, rather than be fined, suspended or expelled from membership by the union, he was not "involuntarily unemployed" but rather out of work through his own choosing and hence not entitled to unemployment benefits. The reasons of that court apply here, to the effect that a claimant enters into membership in his union of his own volition, because of some contract voluntarily entered into outside of his employment which, in his opinion, may prove more advantageous to him financially, and because he felt that his best financial interests

would be served thereby; that if a claimant desired to retain his membership he was bound by those by-laws, for as between himself and the union such bylaws were not unreasonable and quite efficacious in achieving union unity essential to the attainment of its objectives; that a worker is within his legal rights in joining a union and abiding by its lawful rules; that, however, when such a union member is unemployed because he refuses to accept nonunion work, at wages less than those established by the union although not less than those prevailing for similar work, rather than be fined, suspended or expelled from membership by the union, he is not involuntarily unemployed, but rather out of work through his own choosing; that there is no compulsion on him to retain his membership in the union; and, therefore, that the statute excludes him from his benefits when he refuses to accept "suitable work."

*Barclay White Co.*, supra, 50–51, states further that while the public policy of the state does encourage membership in labor organizations, the retention of membership therein is not a surrender to circumstances of the kind and quality which will turn voluntary unemployment into involuntary unemployment. It states further that it would do great violence to the clear and unequivocal wording of the statute to hold that a labor or any other organization can control payments of unemployment benefits to its members by merely forbidding them to work at wages less than those set by it, "or with certain persons, or at certain places, or under certain conditions"; and that if eligibility under such conditions is to be added to the act, it should be done by the legislature.

In the present case, the plaintiff, in refusing non-union work solely for the latter reason, is refusing to expose himself unequivocally to the labor market

and is making himself available for work upon a restricted and contingent basis only, and subject to the condition of his union membership which he is prescribing. The record shows no compelling reason, beyond the plaintiff's own control, limiting him to union membership. See *Leclerc* v. *Administrator,* 137 Conn. 438, 440. The Unemployment Compensation Act was never intended to allow unemployment benefits, otherwise denied, solely for the reason that the claimant was a member of a private organization, even though a labor organization, whose rules would be violated by accepting nonunion work, or because of some private contract voluntarily entered into by the claimant, or because of some order of a union business agent, individually or otherwise.

The unemployment of the plaintiff is voluntary, and for a personal reason not connected with his employment, rendering him not available for work within the meaning of § 31-235 (2) and § 31-236.

## V

The Unemployment Compensation Act should not lend support to union regulations or orders of union business agents when contrary to statutes and to public policy. The conclusion and the reasoning in the *Chambers* case, supra, appear "to be universally adopted in other jurisdictions." *Thornbrough* v. *Stewart,* 232 Ark. 53, 56. The view taken by the "majority of the states," denying benefits under circumstances similar to the instant case, is said to provide "a reasonable, if incomplete solution to a knotty problem." Note, "Withdrawal of Unemployment Compensation Benefits for Refusal to Accept Work in Violation of Union Rules." 56 Yale L.J. 384, 395.

The court is compelled to conclude that the refusal of the plaintiff to accept the work being

offered by Keystone was a failure without sufficient cause to accept suitable work offered by an employer within the meaning of § 31-236 (1); that the unemployment of the plaintiff is voluntary and for a personal reason not connected with his employment; and that he is not available for work within the meaning of §§ 31-235 (2) and 31-236.

The appeal is sustained, and the decision of the commissioner reversed. Accordingly, this appeal is remanded to the unemployment compensation commissioner for the third district with direction to amend his finding as follows: (1) By striking out so much of paragraph 6 thereof as states "and that claimant had no choice but to leave Keystone Masonry," and all of paragraph 7 of said finding. (2) By incorporating in said findings the following: (a) On February 16, 1967, and during working hours thereafter, employment has been available to said claimant, Marcel Lemelin, with appellant Keystone Masonry, Inc., and (b) said claimant voluntarily refused to accept suitable work available for him with appellant without sufficient cause. (3) By entering a decision disapproving and denying the unemployment compensation benefits in question and reversing the decision of the administrator.