IN THE MATTER OF: WILLIE BEATTY, JR. S. S. No. 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 LONGSHOREMAN-CLAIMANT, ET AL AND WILMINGTON SHIPPING COMPANY POST OFFICE BOX 1809, WILMINGTON, NORTH CAROLINA 28401 ET AL AND EMPLOYMENT SECURITY COMMISSION OF NORTH CAROLINA, RALEIGH, NORTH CAROLINA

No. 104

(Filed 11 December 1974)

Master and Servant § 108— unemployment compensation — guaranteed annual income plan — effect of requirements on availability for work

Claimants seeking unemployment benefits were not available for work within the meaning of G.S. 96-13 (3) where, in compliance with terms of a guaranteed annual income plan provided for in their collective bargaining contract, they were required to report each weekday

to a hiring center and remain there until 8:15 to 9:15 a.m., but temporary jobs for which they were qualified, including construction work, maintenance, and forklift operation, generally required that work begin between 7:00 and 8:00 a.m.

ON *certiorari* to review the decision of the North Carolina Court of Appeals, reported in 22 N.C. App. 563, 207 S.E. 2d 321, finding no error in the judgment of *Peel, J.,* 10 December 1973 Civil Term of NEW HANOVER Superior Court.

The claimant, Willie Beatty, Jr., filed a claim for unemployment insurance benefits. On 5 June 1973, his case and one hundred twenty-five additional claims were removed to the Employment Security Commission and by consent consolidated because of common interest and similarity of issues. Pursuant to this order, testimony concerning the consolidated cases was taken at Wilmington by Hearing Officer Garland D. Crenshaw on 21 June 1973, pertaining to forty-three longshoremen, and at Morehead City on 22 June 1973, concerning claims of eighty-three longshoremen.

On 14 August 1973, the consolidated cases were heard by the Chairman, who found facts which may be summarized as follows:

The claimants are longshoremen employed either at Wilmington, Southport, or Morehead City pursuant to a collective bargaining agreement between the South Atlantic Employers Negotiating Committee and the International Longshoremen's Association, AFL-CIO (ILA).

The existing collective bargaining contract provides, *inter alia,* for a guaranteed annual income fund (GAI) to furnish benefits to employees who are ready, willing, and able to work but who could not do so because of lack of work as longshoremen. The plan is financed by contributions from those ordering the longshoremen for work. The contributions are derived from a tonnage assessment on cargoes handled by the longshoremen and are paid to the trustees of the fund.

The guaranteed annual income amounts to two hundred fifty hours for each quarter at the pay rate of $5.50 per hour, with twenty-five percent to be withheld for year-end adjustments. In order to be eligible for payments, the longshoremen must report each weekday (excluding holidays) to a hiring center, where they are selected for work. The procedure for show-

ing availability is for the employees to report to a hiring hall, where the men report daily to "shape up," which is a trade term used to mean that the men personally appear and evidence their availability for work as longshoremen by presenting a plastic badge to "badge in" and "badge out." Employees "badge in" each workday between the hours of 6:00 a.m. and 7:30 a.m., and if work is not available to them, they "badge out" *between 8:15 a.m. and 9:15 a.m.*, at which time they may seek part-time employment. According to the GAI contractual obligation, a longshoreman loses all benefits under the plan if he accepts full-time outside employment.

Longshoremen generally qualify for outside employment as construction workers, helpers, laborers, material handlers, lift operators, and related work which carries a prevailing wage of $2.50 per hour. Ninety percent of the opportunities for work are in construction where the employers prefer permanent workers but will, on occasion, hire temporary help who must report for work *not later than 8:00 a.m.*

Upon these findings, to which claimants filed no exception, the Commission concluded that GAI longshoremen are "neither available for permanent nor temporary employment and are therefore not eligible for unemployment insurance benefits." An order was entered consistent with this conclusion. Claimants appealed to the Superior Court, where the decisions of the Commission were affirmed. Claimants appealed to the North Carolina Court of Appeals, and that Court found no error in the judgment entered in the Superior Court. We allowed certiorari to the North Carolina Court of Appeals on 24 September 1974.

*Andrew A. Canoutas and Gleason & Miller for claimant appellants.*

*H. D. Harrison, Jr., Howard G. Doyle, and Garland D. Crenshaw, by H. D. Harrison, Jr., for the Employment Security Commission.*

BRANCH, Justice.

The sole question presented by this appeal is whether claimants, by adhering to the contractual obligations of the Guaranteed Annual Income agreement, met the availability requirement of G.S. 96-13(3).

G.S. 96-13 (3), in relevant part, provides:

"An unemployed individual shall be eligible to receive benefits with respect to any week only if the Commission finds that—

(3) He is . . . available for work. . . ."

The phrase "available for work" is not susceptible of precise definition, and whether a person is available for work differs according to the facts of each individual case. *In re Watson,* 273 N.C. 629, 161 S.E. 2d 1; *In re Miller,* 243 N.C. 509, 91 S.E. 2d 241. We recognize that the General Assembly "intended to provide a wide field of usefulness for this agency [the Employment Security Commission] for social security and for mitigating the economic evils of unemployment." *Unemployment Compensation Commission v. Willis,* 219 N.C. 709, 15 S.E. 2d 4. In creating the statutory framework for the attainment of this laudable objective, however, the General Assembly required, *inter alia,* that a claimant for benefits under the statute remain available for suitable employment.

The key to decision of this appeal lies in our interpretation of the statutory phrase "available for work." More specifically, the question is whether claimants, by their adherence to the terms of the guaranteed annual income provisions of their collective bargaining agreement, have placed themselves in a position which, for all practical purposes, eliminated their availability for work.

It is fundamental that the intent of the General Assembly controls judicial interpretation of a statute. *In re Watson, supra; In re Abernathy,* 259 N.C. 190, 130 S.E. 2d 292; *Shue v. Scheidt,* 252 N.C. 561, 114 S.E. 2d 237. In this respect, we find assistance in the legislative declaration of public policy set forth in G.S. 96-2, which, in part, provides:

"As a guide to the interpretation and application of this chapter, the public policy of this State is declared to be as follows: Economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of this State. *Involuntary unemployment* is therefore a subject of general interest and concern which requires appropriate action by the legislature to prevent its spread and to lighten its burden which now so often falls with crushing force upon the unemployed worker and his

family. . . . The legislature, therefore, declares that in its considered judgment the public good and the general welfare of the citizens of this State require the enactment of this measure, under the police powers of the State, for the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed *through no fault of their own.*" (Emphasis supplied.)

This availability requirement has generally been viewed as an indication of a claimant's attachment to the labor force and is designed *to test each claimant's attachment to the labor market.* 34 N.C. L.Rev. 591. *See generally* 81 C.J.S. *Social Security and Public Welfare* § 203. One writer has attempted to explain the availability requirement in the following manner:

> "The availability requirement is said to be satisfied when an individual is willing, able, and ready to accept suitable work which he does not have good cause to refuse, that is, when he is genuinely attached to the labor market. Since, under unemployment compensation laws, it is the availability of an individual that is required to be tested, the labor market must be described in terms of the individual. . . ."

Freeman, *Able to Work and Available for Work,* 55 Yale L.J. 123, 124.

There are, of course, limits to the availability requirement because carrying the concept too far would result in the unwarranted disqualification of otherwise qualified workers and thwart the legislatively declared objectives of the Act. *Id.* at 126. ". . . The problem is . . . whether or not the restrictions [which the claimant places on his employment] serve to limit the work which a claimant can accept to such a degree that he is no longer genuinely attached to the labor force. It is essentially a matter of degree to ascertain to what extent a claimant can impose restrictions and on what these restrictions must be based." Note, 34 N.C. L.Rev. 591, 604.

In a lead article by Lee G. Williams, entitled *Eligibility for Benefits,* 8 Vand. L.Rev. 286, 292, we find the following pertinent statement:

> "Obviously, the whole inquiry as to whether a particular claimant for benefits is available for work is an inquiry designed to find out whether the claimant actually

wants to work *and whether he is so situated that he can work*. Every fact which is to be ascertained must be a fact which is evidence of this attitude and this condition. 'The availability requirement is a test to discover whether claimants would, in actuality, now be working, were it not for their inability to obtain work that is appropriate for them.' " (Emphasis ours.)

The recent advent of supplemental unemployment benefit plans and guaranteed annual income plans has introduced a new dimension into the field of unemployment compensation. Although the question here presented seems to be one of first impression, we find guidance in analogous cases dealing with the effect of collective bargaining agreements on eligibility for unemployment compensation benefits, when the claimants refused proffered employment.

In *Lybarger Unemployment Compensation Case,* 203 Pa. Super. 336, 201 A. 2d 310, the claimant was a union member working under a collective bargaining agreement which provided, *inter alia,* that to facilitate an adjustment of personnel, the employer would retain by seniority the number of chain machine operators necessary to maintain production at the normal forty-hour-per-week level. When the senior group of employees had earned, from January 1 of the calendar year, gross earnings of $5,000, plus or minus $50, those workers would go on lay-off status for the remainder of the year or until all younger workers were recalled and additional senior workers were required in seniority order. This cycle of work and lay-off continued throughout the duration of the collective bargaining agreement. Plaintiff had earned the maximum amount by October. Under the terms of the agreement, he would have remained in non-working status until the subsequent January 1. Claimant filed for state unemployment compensation. In denying benefits, the Court stated:

". . . Although we agree that the purpose may bè an admirable one [sic] it was not the intention of the legislature to use the unemployment compensation fund to subsidize such a plan. To contend that the claimant's unemployment was due to no fault of his own is to fly into the face of ordinary common sense."

In *Mills v. Mississippi Employment Security Commission,* 228 Miss. 789, 89 So. 2d 727, the claimant refused to accept

non-union employment on the ground that he would not work for less than the union scale fixed by a duly negotiated collective bargaining agreement. Noting that the Employment Security Act made no distinction between union and non-union workers, the Court held that the claimant had rendered himself unavailable for work.

The language of the Delaware Supreme Court in *Bigger v. Unemployment Compensation Commission*, 43 Del. 553, 53 A. 2d 761, clearly states the cardinal principle upon which these decisions and our decision in instant case rest:

> "In the body of the Act, the Legislature has defined with some care the standards for determining who is entitled to benefits from the reserve fund created. Nothing in the Act suggests that a union or a group of employers or any one else may add to, or substract from, the standards laid down in the Act itself.

> "From what has been said, it is clear that the Legislature had no thought of strengthening or of weakening the power of unions. Its purpose was to protect all workmen involuntarily unemployed. Membership in a union gives an individual no greater rights under the Act than he otherwise has. Likewise, a group of individuals cannot secure higher privileges merely by adopting a rule which binds themselves to a certain course of conduct. We cannot agree with a theory which would have the effect of substituting a union rule for a statutory requirement. If a man wants to benefit by the Act, he must comply with its provisions; his unemployment is not involuntary if he refuses a job without good cause; 'good cause' means those reasons contained in the Act."

*See also Lemelin v. Administrator, Unemployment Compensation Act*, 27 Conn. Sup. 446, 242 A. 2d 786; *Bedwell v. Review Board of Indiana Employment Security Division*, 119 Ind. App. 607, 88 N.E. 2d 916; *Mattey v. Unemployment Compensation Board of Review*, 164 Pa. Super. 36, 63 A. 2d 429 (dictum).

A leading case in this area is *Chambers v. Owens-Ames-Kimball Co.*, 146 Ohio St. 559, 67 N.E. 2d 439. There claimant was referred to an otherwise suitable job but refused to accept the referral on the sole ground that acceptance of the proffered work, a non-union job, would violate the rules of his union. The

Court denied benefits and emphatically rejected such a basis for an approach to compensation:

> ". . . [T]he interpretation of [claimant] would make the operative effect of a refusal to work depend entirely upon the whim or caprice of an organization to which the applicant for unemployment compensation might belong. It is within the range of possibility that a labor organization might adopt a rule that no member could work where negroes are employed, or where the employment calls for more than four hours as a day's work, or where the place of business of an employer is more than a mile from the residence of the unemployed member, or where an employer fails to maintain certain facilities relating to the conditions of employment, even though not required by law so to do, or where an employer does not pay a wage equal to the union wage for the same kind of work.
>
> "Under such an interpretation, the right of the applicant for unemployment compensation would not be fixed or determined by the provisions of the statute but by rules adopted by organizations in which the applicant has membership. Such interpretation of the statute, and as a consequence its administration in conformity to such interpretation, is clearly untenable."

We find only two cases in which this Court has considered the "available for work" requirement. In *In re Miller, supra,* we held that a textile worker whose Seventh Day Adventist teachings impelled her not to work from sundown Friday until sundown Saturday, and who actively sought employment which would not require her to perform secular work during this period, was not unavailable for work. We held explicitly that the "availability for work" criterion did not require one to engage in work offensive to the moral conscience of the claimant.

Similarly, in *In re Watson, supra,* we held that an electrical plant worker who had been involuntarily discharged from her job on the first shift, and who thereafter rejected a second-shift job solely on the grounds that she could not obtain adequate care and supervision for her nine-year-old child, did not thereby render herself unavailable for employment. Speaking through Justice Lake, the Court stated:

> "Here, as in the *Miller* case, we do not undertake to formulate an all-embracing rule for determining what con-

stitutes being 'available for work.' Here, as there, we reject the contention that to be eligible for benefits under the act one must be available for work at any and all times. If, as we there held, one is not rendered unavailable for work by her unwillingness, by reason of moral convictions, to accept work during the period within which ninety five per cent of the jobs in her community are to be found, even though her moral standards are not accepted by the majority in the community, it surely follows that one, who actively seeks employment during the hours in which seventy per cent of the available jobs in the community in her line of work are normally found, is not rendered unavailable for work by her refusal of employment during other hours, which would require her to leave her nine year old child unattended and unsupervised."

Decision of the question presented by this appeal is not complicated by evidentiary questions since the Commission's findings of fact are amply supported by the evidence in the record. Under these circumstances, this Court is bound by the Commission's findings of fact. *Employment Security Commission v. Freight Lines*, 248 N.C. 496, 103 S.E. 2d 829; *Employment Security Commission v. Monsees*, 234 N.C. 69, 65 S.E. 2d 887.

In instant case the hours prescribed for "badging-in" and "badging-out" pursuant to the GAI plan obviously conflicted with the hours in which suitable temporary, outside employment could well have been available to claimants. The unchallenged findings of the Commission included the following statement:

"According to their GAI contractual obligation, longshoremen cannot accept outside, steady, full-time employment. They are qualified in the main for general construction work, helpers, laborers, material handlers, forklift operators, maintenance men, and related permanent or temporary work. . . . Employers in both areas prefer permanent workers but will hire temporary help, beginning not later than 8:00 A.M. The majority of orders from employers in the construction industry specify that temporary help begin work between 7:00 A.M. and 8:00 A.M., Monday through Friday. Therefore, the requirement to shape up or badge in and badge out excludes the vast majority of longshoremen from chances of employment, even on a temporary basis. . . ."

It is obvious that claimants, by adhering to the contractual requirements making them eligible for GAI benefits, effectively removed themselves from the labor market in contravention of the requirements of G.S. 96-13(3). The rights of claimants to unemployment compensation must be determined by the statutory provisions of Chapter 96 rather than by rules promulgated by a union, other employee groups, an employer, employer groups, or anyone else.

The Court of Appeals correctly found no error in the judgment of the Superior Court affirming the legal conclusion of the Commission, which determined that claimants were not available for work within the meaning and intent of Chapter 96 of the General Statutes and therefore were not eligible for unemployment benefits.

The decision of the Court of Appeals is

Affirmed.