806 A.2d 357

**LAUREL RACING ASSOCIATION LIMITED PARTNERSHIP et al.,**

v.

**Josepha M. BABENDREIER et al.**

**No. 0933, Sept. Term, 2001.**

Court of Special Appeals of Maryland.

Sept. 3, 2002.

John W. Kyle (Hahn, Kyle & Hollrah, LLP on the brief), Columbia, for appellants.

Matthew W. Boyle, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, on the brief for appellee, Board of Appeals).

Joel A. Smith, Linda D. McKeegan, Steven M. Lubar and Kahn, Smith & Collins, P.A., Baltimore, on the brief for appellee, Babendreier

Argued before KENNEY, KRAUSER and THEODORE G. BLOOM (Ret'd, specially assigned), JJ.

**3**

KENNEY, Judge.

Appellants, the Laurel Racing Association Limited Partnership ("Laurel Racing"), the Maryland Jockey Club of Baltimore City, Inc. ("MJC"), and Race Track Payroll Account, Inc. ("RTPA"),[1] appeal the decision of the Circuit Court for Anne Arundel County in favor of appellees, Josepha Babendreier, the Board of Appeals (the "Board"), and the Department of Labor, Licensing and Regulation ("DLLR").[2] The Board had affirmed its hearing examiner's ruling that Babendreier was eligible for unemployment benefits. We have consolidated and reworded appellant's questions for review as follows:[3]

---

1. Laurel Racing and MJC were not parties to the unemployment proceedings before the Department of Labor, Licensing and Regulation, but joined RTPA as petitioners before the Circuit Court for Anne Arundel County. They claim standing based upon the collective bargaining agreement they entered into with the United Food and Commercial Workers Union, Local 27.

2. The Board filed a response to RTPA's petition for judicial review before the circuit court and a brief in this appeal. Md.Code Ann. (1991, 1999 Repl.Vol., 2000 Supp.), § 8–512(a)(3) of the Labor and Employment Article ("LE"), provides: "The Board of Appeals may be a party to an appeal under this section and may be represented by the Attorney General[.]"

3. Appellants presented the following questions:
   I. Did the Circuit Court exceed its authority by affirming the Board's Decision on a ground that was not relied on by the Hearing Examiner?
   II. Did the Circuit Judge err by failing to address the Appellants' argument concerning the arbitrary nature of the Board's decision, and by failing to find the agency's action arbitrary in light of its directly inconsistent decision in *Keller*?
   III. Did the Circuit Judge and the Board of Appeals err by finding that Appellee Babendreier was eligible for unemployment benefits, despite her failure to be fully available to work as required by the Court of Appeals' Decision in *Robinson*?
   Babendreier presented the question as follows:
   Did the UI claimant, Josepha M. Babendreier, satisfy her obligation under Lab. & Employ. § 8–903(a)(1)(iii) to be "actively seeking work" when she applied for full-time employment at least twice each week with prospective employers nearby her home, although she did not travel 60 miles a day from her home in Damascus, [Maryland,] to

Did the Board err in concluding that Babendreier was "available" for work pursuant to the Labor & Employment Article, § 8–903(a)(1)(ii) of the Maryland Annotated Code?

Finding no error, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Appellants own and operate Laurel Park and Pimlico Race Course ("Pimlico"), in addition to Rosecroft Raceway, a live racing and simulcast venue for live races held at other tracks. Babendreier was employed as a Mutuel Department teller by RTPA, which provides employee and payroll services at the race tracks.[4]

For many years, Laurel Park and Pimlico employees have been represented by United Food and Commercial Worker's Union, Local 27 (the "Union" or "UFCW 27"), of which Babendreier was a member. Their employment relationship is governed by the collective bargaining agreement (the "Agreement" or "Separate Agreements"), effective July 1, 1996, through June 10, 1998, by and between Laurel Park and Pimlico, collectively referred to therein as "Mile Tracks," and the Union. On or about May 31, 1998, a "Memorandum Agreement" was executed, which included RTPA as an "Employer under the Separate Agreements," in addition to Laurel Park and Pimlico.[5] The Agreement reads, in pertinent part:

---

the Employer's "live track" at Pimlico Race Course to sign-in to apply for work each day of the Employer's race meet?
The Board posed the question as follows:
    Based upon the undisputed facts found by the agency, could a reasoning mind reasonably conclude that Babendreier was available for work within the meaning of § 8–903(a)(1)(iii)?

4. A mutuel teller accepts bets from patrons. These tellers are all unionized and have a specified seniority system.

5. The "Memorandum Agreement" also extended the effective date of the Agreement "through and including June 30, 2000," and included a provision regarding seniority for any "Regular Employee" assigned to work at Rosecroft Raceway, but who elected to sign-in at either Laurel Park or Pimlico.

## AGREEMENT

These separate Agreements are made and entered into by LAUREL RACING ASSOC., INC., generally known as LAUREL PARK, and THE MARYLAND JOCKEY CLUB OF BALTIMORE CITY, Inc., generally known as a PIMLICO RACE COURSE (each being referred to as the "Employer" and the two Employers together constituting the Maryland Mile Thoroughbred Race Tracks licensed by the Maryland Racing Commission and being sometimes hereinafter collectively referred to as the "Mile Tracks,") and UNITED FOOD AND COMMERCIAL WORKERS UNION, LOCAL 27 (herein referred to as the "Union"), as of the 1st day of July, 1996.

## WITNESSETH

In consideration of the mutual promises contained in this Agreement, and for other good and valuable consideration, each Employer agrees with the Union as follows:

\* \* \*

## ARTICLE 4

### Seniority

Section 1.

a. The purpose of seniority is to provide a right of preference in employment measured by length of continuous service with the Employer, including service prior to the effective date of this Agreement. Except as set forth in Section 1(c) of this Article, an employee shall have no preference for work assignment until he has obtained seniority standing as a Regular, Extra or Saturday/Holiday Employee in accordance with Section 2 of this Article.

b. All employees shall be considered Probationary Employees at an Employer's track until they have completed 30 days of work from the date they first began to work at such track. A Probationary Employee shall have no rights to any work assignment and the decision

of the Employer in its sole discretion whether or not to give such Probationary Employee any work assignment shall be final.

c. All employees who have completed the 30 days probationary work period but have no Regular, Extra or Saturday/Holiday seniority standing shall be placed on a "Days Worked Seniority List" in the order of total days worked for the Employer. The employee with the most days worked shall be selected first for purposes of work assignment. Each department at each Employer's track shall maintain its own work list and the Mutuel Department at each Employer's track shall post such list on a weekly basis on its main bulletin board. Any employee who disputes his order of placement on the Days Worked Seniority List must bring such dispute to the attention of his Department Head on the day the list is posted. Failure by the employee to do so is at the employee's own risk and the Employer shall have no liability for not having given such employee a work assignment on that or any previous day.

\* \* \*

e. The most senior employee within a department shall have the right to work on any given day in the department in which he has seniority. (For example, if there are 20 positions in the Parking Department, then the 20 employees with the most Parking Department seniority will be assigned those 20 positions. The 21st employee according to seniority will not have the right to work before any of the first 20 senior employees.)

Thus, on a normal racing day with the exception of Saturdays and Holidays, job assignments shall be filled as follows:

*First:* by Regular employees.

*Second:* by Extra employees.

*Third:* by Saturday and Holiday employees.

*Fourth:* by employees on the Days Worked Seniority List at the running track.

*Fifth:* by any other employees at the sole discretion of the Employer.

\* \* \*

## ARTICLE 5

### Layoffs

Section 1.

The determination of whether there shall be a layoff is the prerogative of the Employer. If employees in any classification in Schedule A [6] are to be laid off, the Employer shall lay off employees in such classifications in accordance with their departmental seniority; that is, commencing with the employee having the least departmental seniority in the affected classification. Extra Employees shall be laid off before Regular Employees; and, in the case of Saturday/Holiday jobs only, Saturday/Holiday Employees shall be laid off before Extra Employees on regular workdays (i.e., days other than Saturday and Holidays). However, layoffs out of the Mutuel Department Money Room shall be by sub-departmental seniority, unless this results in the employee not working; then Money Room layoffs shall be by departmental seniority.

\* \* \*

Section 6.

Any Regular Employee who is laid off under this Article shall remain a Regular Employee for the duration of the calendar year in which he is laid off. If he does not work enough days to maintain his Regular seniority, he shall be placed at the top of the Extra list in the following year, and shall then be slotted for the third year onto a seniority list according to the days worked in the previous year. However, if he is restored to the Regular seniority list within three (3) years after the date of his layoff, his

---

6. Babendreier was a Schedule A employee.

seniority as a Regular shall include the seniority he had accrued prior to the date of his layoff, unless he has lost his seniority pursuant to any of reasons 1 through 4 of Section 6 of Article 4.

\* \* \*

Section 9.

When the work force is increased, or when there is work available, following a layoff, the Employer shall recall employees to a classification in the reverse order in which they were laid off, so that the last employee laid off in any classification shall be the first recalled in that classification. Employees who bumped downward, upward or laterally as a result of the layoff shall be returned to their usual classifications in the reverse order in which they bumped during a layoff.

The Agreement did not require Babendreier to report to work each day, did not require appellants to notify employees that work was available on any given day, and did not require employees to inquire about the availability of work. Although no contact was required by either Babendreier or her employer, appellants mailed to all employees a postcard offering work assignments in advance of the Preakness, the Pimlico Special, and the Kentucky Derby.

When live racing meets alternate between Laurel Park and Pimlico, each venue utilizes a separate employee seniority list based upon an employee's period of service at that respective track. When live racing takes place at a particular track, the race is simulcast at the other track and at Rosecroft.

Babendreier primarily worked during the Laurel Park meets, but received work assignments for special events at the Pimlico meets. As a result of her tenure at Laurel Park, Babendreier was designated with "Extra–Employee" seniority,[7] guarantying her work during Laurel Park's "live racing

---

7. An "Extra Employee" "refers to an employee who has attained and continuously maintains Regular Seniority standing under the terms of Article 4" of the Agreement.

days." [8]  On July 12, 1998, Babendreier was one of eight "bid winners" for positions as "full-time tellers at Rosecroft for the Laurel Meet."  She thereby became a full-time "Regular Employee" on the Laurel Park seniority roster.[9]

Babendreier maintained, however, only a "Days Worked" status at Pimlico.[10]  As a result, she was not guaranteed work at Pimlico when live meets were held at that track.[11]  To be eligible for work at Pimlico, Babendreier, on a day-by-day basis, had to commute to the track, sign in, and wait to see whether her "Days Worked" seniority status provided her with a work assignment.  If enough other workers signing in had a higher seniority status, Babendreier risked not being assigned work that day.

Between October 1999 and February 20, 2000, during the Laurel Park meets, Babendreier worked at her regularly-scheduled assignment as a teller at Rosecroft.  On or about February 20, 2000, Laurel's winter meet ended and live racing at Pimlico commenced.  Except for the Preakness and the

---

8.  "[L]ive racing days" and "racing days" are defined in the Agreement as "any days on which live or live and simulcast racing is conducted by the Employer."  Live racing days are assigned to MJC entities by the Maryland Racing Commission and are grouped into "meets."

9.  On February 21, 2000, a bid was posted for three full-time teller positions at Rosecroft for the "Pimlico at Laurel Meet."  One of the bid winners, Judy O'Haver, was a "Days Worked" employee with a Union date of October 28, 1998.  On March 24, 2000, a subsequent bid was posted for seven full-time tellers at Rosecroft for the Pimlico meet.  In both instances, Babendreier failed to apply for the vacant positions, although she was almost assured of being awarded either bid.  This evidence was offered by appellants to prove that work was available to Babendreier for the Pimlico meets, but that she failed to accept guaranteed work assignments.

10.  The record indicates that as of May 21, 2000, Babendreier was ranked 17th on the Pimlico "Days Worked" list, with 121 days worked at Pimlico during her twenty years of employment.

11.  "Days Worked Seniority List Employee" is defined in the Agreement as "an employee who has completed his [or her] thirty day probationary period but has not attained or has not continuously maintained Saturday/Holiday, Extra or Regular Seniority standing under the term of Article 4."

Pimlico Special stakes race, Babendreier did not seek any Pimlico work assignments.

On or about April 1, 2000, Babendreier filed a claim for benefits with DLLR, which RTPA opposed. The claims examiner granted her claim for unemployment benefits on April 25, 2000. RTPA appealed the claims examiner's determination to the Division of Appeals.

On June 5, 2000, a hearing was held before a DLLR hearing examiner for the purpose of determining Babendreier's unemployment benefits eligibility. RTPA argued that Babendreier was not entitled to unemployment benefits because she was an active employee, who had failed to make herself "available for work" pursuant to Md.Code Ann. (1991, 1999 Repl.Vol., 2000 Supp.), § 8–903(a)(1)(ii) of the Labor and Employment Article ("LE"). RTPA introduced evidence that if Babendreier had traveled to Pimlico and signed-in, she would have been assigned work on "every single Saturday" and many other days during the Pimlico meets. Babendreier argued that she was not an active employee, based on the transfer of meets from Laurel to Pimlico, and that she had been "laid-off." She acknowledged that she had not pursued work at Pimlico during its meets. Instead, and rather than commuting sixty miles to Pimlico without any guarantee of receiving a work assignment, she decided to look for full-time work closer to her home.

After the hearing, the hearing examiner rendered the following decision:

### FINDINGS OF FACT

The claimant's benefit year commenced August 24, 1999. The claimant's week benefit amount is $239. The employer operates two thoroughbred horseracing tracks in Maryland, Laurel Park and Pimlico. The employer's premises are open throughout the year. Live racing alternates between the two racing venues. When there is no live racing, simulcast racing is available to patrons attending the racecourse.

Each racetrack has a separate seniority list. When live racing takes place at the Laurel Park, the claimant is guaranteed work due to her seniority status.

When live racing shifts to Pimlico, the claimant's work at Laurel Park ends. Again, the claimant is not guaranteed work at Pimlico, but in order to be eligible for work at Pimlico, the claimant is obligated to report to Pimlico and sign up for work. If work is offered, the claimant is assigned work. If no work is available, the claimant is not offered work. The claimant receives no compensation for showing up at Pimlico in search of work.

After the claimant filed for benefits, the claimant worked from October 12, 1999 through February 21, 2000. Live racing at Laurel Racecourse ended on February 20, 2000. Thereafter, the claimant worked two other events for her employer. These were special events, the Pimlico Special and the Preakness. Other than these two events, the claimant sought work elsewhere. The claimant lives 60 miles away from the Pimlico racecourse. The claimant did not report to Pimlico to sign up and see if work was available. The claimant opted to seek work near her home. The claimant has been seeking full-time work. The claimant has been making two job contacts per week as mandated under the law. The claimant's reason for not seeking work at Pimlico is because she is not guaranteed work at Pimlico.

## CONCLUSIONS OF LAW

Md.Code Ann., Labor & Emp. Article, Section 8–1003 (Supp.1996) provides for a disqualification from benefits where the claimant is discharged or suspended as a disciplinary measure for misconduct connected with the work. The term "misconduct" is undefined in the statute but has been defined as " . . . a transgression of some established rule or policy of the employer, the commission of a forbidden act, a dereliction of duty, or a course of wrongful conduct committed by an employee, within the scope of his employment relationship, during hours of employment, or

on the employer's premises." *Rogers v. Radio Shack*, 271 Md. 126, 132, 314 A.2d 113 (1974).

Md.Code Ann., Labor & Emp. Article, Section 8–903 (Supp. 1996) provides that a claimant for unemployment insurance benefits shall be (1) able to work (2) available for work; and (3) actively seeking work. In *Robinson v. Maryland Employment Sec. Bd.*, 202 Md. 515, 97 A.2d 300 (1953), the Court of Appeals held that a claimant may not impose restrictions upon his or her willingness to work and still be available as the statute requires.

## EVALUATION OF EVIDENCE

The claimant has not been separated from her position of record. The claimant is guaranteed work when live racing takes place at Laurel Park. Therefore, the claimant's separation constitutes a layoff. In a layoff the employer bears the burden of proving, by a preponderance of evidence, that the claimant's layoff was due to some degree of misconduct on the claimant's behalf.

There is insufficient [evidence] to establish that the claimant's layoff was due to any degree of misconduct. The nature of the employer's business is the reason for the claimant's layoff status. Based on these facts, there is no degree of misconduct on the claimant's behalf. Therefore, the Hearing Examiner will reach and rule upon the next issue in this case.

In review of the contract agreement between the claimant and her employer, the claimant is guaranteed work only at the Laurel Park. The claimant is not guaranteed work at the Pimlico racecourse. In review of the documents presented, the claimant is obligated to attend Pimlico and seek work during her layoff status.

The credible evidence establishes that the claimant has been seeking full time work opportunities during her layoff status. These opportunities are separate and apart from her seeking work at Pimlico Raceway. Based on the evidence

presented, the claimant is in compliance with the above-cited law.

If during the claimant's layoff period, the employer makes the claimant an offer and the claimant refuses the offer, the employer has a remedy under Md.Code Annotated, Labor and Emp. Article, Title 8, Section 1005.

### DECISION

IT IS HELD THAT the claimant was discharged, but not for gross misconduct or misconduct connected with the work, within the meaning of Md.Code Ann., Labor & Emp. Article, Sections 8–1002 or 8–1003 (Supp.1996). No disqualification is imposed based upon the claimant's separation from employment with Racetrack Payroll Account. The claimant may contact the local employment office concerning the other eligibility requirements of the law.

IT IS HELD THAT the claimant is able, available and actively seeking work within the meaning of Md.Code Ann., Labor & Emp. Article, Section 8–903 (Supp.1996). Benefits are allowed for the week beginning February 19, 2000 and thereafter, provided that the claimant meets the other eligibility requirements of the Maryland Unemployment Insurance Law.

The determination of the Claim Specialist is affirmed.

RTPA filed a petition for review with the Board. On October 19, 2000, the Board affirmed the hearing examiner's decision. On November 20, 2000, appellants filed in the Circuit Court for Anne Arundel County a petition for judicial review. The Board moved to remand the case to the Board, requesting in its proposed order that the court submit the following questions to a hearing examiner: [12]

---

12. These questions appeared in the proposed order, whereas the motion contained the following questions:

   (a) Did the labor agreement require the claimant to report to Pimlico Race Course while it was holding live racing?

(a) Did the labor agreement require the claimant to report to Pimlico Race Course while it was holding live racing?

(b) If the labor agreement did require her to report to Pimlico, did her failure to report render her available for work, within the meaning of § 8–903(a)(1)(ii), even though reporting to Pimlico did not guarantee that she would get work?

(c) Was the claimant's failure to report to Pimlico a failure to actively seek work, within the meaning of § 8–903(a)(1)(iii), even though she was seeking work elsewhere?

(d) Was there an offer of suitable employment to the claimant from the employer? If so, did the claimant refuse that offer? If so, did she have good cause for the refusal?

Appellants opposed the Board's motion to remand and sought counsel fees.

In its June 6, 2001 opinion and order, the circuit court considered whether Babendreier "was not available for work because she declined to go to Pimlico where she was not guaranteed work." The court noted:

Ms. Babendreier lives sixty miles from Pimlico. The examiner found she had tried to get work elsewhere, including making two contacts per week. However, she didn't want to go and work where she had low seniority with the understanding she wasn't guaranteed any work.

We agree that Ms. Babendreier cannot impose unreasonable conditions upon her willingness to work and still be considered available. *Robinson v. Maryland Employment Sec. Bd.*, 202 Md. 515, 97 A.2d 300. The Examiner determined that her declining to go to Pimlico was a reasonable conclusion to reach. However, the Board reached a different conclusion on facts that appear to be close to the ones in the Keller case (9–22–99).

---

(b) If the labor agreement did require her to report to Pimlico, did her failure to report render her unavailable for work even though reporting to the track did not guarantee that she would get work?

*If we consider the decision of the Board of Appeals without Keller, we would find substantial justification for the Board's decision. If we need to reach our conclusion on the facts and the law, we find that it is not reasonable to make her go to Pimlico for work that does not necessarily exist.*

There is an argument as to who should have called whom to see if there was work. Our understanding is that she had to show up and take her chances, but if there was work the employer could [have] certainly called her and cut its losses.

The Board moved to remand. Upon our ruling, we don't believe that [it] is necessary. However, there was a reasonable possibility that the remand might have been necessary; we reject any claim of lack of substantial justification, and award no fees.

Accordingly, it is this [31st] day of May, 2001

ORDERED that the decision of the *Board of Appeals* is affirmed. Appellant to pay costs.

[Emphasis in original.]

Appellants filed a notice of appeal on July 3, 2001.

## STANDARD OF REVIEW

The scope of judicial review of a determination by the Board in an unemployment compensation insurance case is set forth in § 8–512(d):

*"Scope of review.*—In a judicial proceeding under this section, findings of fact of the Board of Appeals are conclusive and the jurisdiction of the court is confined to questions of law if:

(1) findings of fact are supported by evidence that is competent, material, and substantial in view of the entire record; and

(2) there is no fraud.

Under this statute, the reviewing court shall determine only: "(1) the legality of the decision and (2) whether there

was substantial evidence from the record as a whole to support the decision." The reviewing court may not reject a decision of the Board supported by substantial evidence unless that decision is wrong as a matter of law. The test for determining whether the Board's findings of fact are supported by substantial evidence is whether reasoning minds could reach the same conclusion from the facts relied upon by the Board." [Citations omitted.]

*Department of Labor, Licensing & Regulation v. Hider,* 349 Md. 71, 77–78, 706 A.2d 1073 (1998).

If, however, we find "no substantial or sufficient evidence to support the factual findings of the Board, the Board's decision will be reversed because it was arbitrary and illegal." *Eastern Outdoor Adver. Co. v. Mayor & City Council of Baltimore,* 128 Md.App. 494, 515, 739 A.2d 854 (1999), *cert. denied,* 358 Md. 163, 747 A.2d 644 (2000). The substantial evidence test is an "assessment of whether the record before the Board contained at least 'a little more than a scintilla of evidence' to support the Board's scrutinized action." *Friends of the Ridge v. Baltimore Gas & Elec. Co.,* 120 Md.App. 444, 466, 707 A.2d 866 (1998), *vacated in part,* 352 Md. 645, 724 A.2d 34 (1999) (citation omitted). The existence of substantial evidence "pushes the Board's decision into the unassailable realm of a judgment call, one for which we may not substitute our own exercise of discretion." *Friends of the Ridge,* 120 Md.App. at 466, 707 A.2d 866.

## DISCUSSION

Appellants claim that Babendreier was unavailable for work by refusing to sign in at Pimlico and wait for an opportunity to receive a work assignment. Appellants contend that, by her failure to do so, she imposed conditions and limitations on her willingness to work and therefore was not "available for work" pursuant to LE § 8–903(a)(1)(ii). In addition, they contend that the Board acted in an arbitrary manner in reaching an opposite conclusion than it reached in *Keller v. Race Track Payroll Account, Inc.,* No. 2876–BR–99 (1999).

Appellees argue that the Board properly held that Babendreier was "available" for work within the meaning of the unemployment eligibility statute. They claim this decision was both legally correct and supported by substantial evidence in the record. They further assert that if Babendreier would be "required to make herself available to a specific employer, whether or not that employer could ensure that she would be given work[,]" she would thereby limit her chances to interview for and accept other employment. In other words, if she made herself available to the appellants for work that was not guaranteed, she would not be available to the rest of the employment market.

■ Maryland's unemployment insurance law is remedial in nature and is intended to prevent economic insecurity and alleviate the consequences of "involuntary unemployment and economic distress." *Johns Hopkins Univ. v. Board of Labor,* 134 Md.App. 653, 659, 761 A.2d 350 (2000); *see* LE § 8–102.[13]

---

13. LE § 8–102 provides:

(a) *Interpretation and application.*—This section is a guide to the interpretation and application of this title.

(b) *Findings.*—The General Assembly finds that:

(1) economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of the State;

(2) involuntary unemployment is a subject of general interest and concern that requires appropriate action by the General Assembly to prevent the spread of involuntary unemployment and to lighten its burden, which often falls with crushing force on the unemployed worker and the family of the unemployed worker;

(3) the achievement of security for society requires protection against involuntary unemployment, which is the greatest hazard of our economic lives; and

(4) security for society can be provided by encouraging employers to provide more stable employment and by the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment, maintaining the purchasing power, and limiting the serious social consequences of poor relief assistance.

(c) *Statement of policy.*—The General Assembly declares that, in its considered judgment, the public good and the general welfare of the citizens of the State require the enactment of this title, under the police powers of the State, for the compulsory setting aside of unemployment reserves to be used for the benefit of individuals unemployed through no fault of their own.

An individual is considered to be unemployed in any week during which the individual:

(1) does not perform work for which wages are payable; or

(2) performs less than full-time work for which wages payable are less than the weekly benefit amount that would be assigned to the individual plus allowances for dependants.

LE § 8–801(b). Eligibility for individual unemployment benefits requires, in pertinent part:

(a) *In general.*—(1) Except as otherwise provided in this section, to be eligible for benefits an individual shall be:

(i) **able to work;**

(ii) **available for work; and**

(iii) **actively seeking work.**

(2) In determining whether an individual actively is seeking work, the Secretary shall consider:

(i) whether the individual has made an effort that is reasonable and that would be expected of an unemployed individual who honestly is looking for work; and

(ii) the extent of the effort in relation to the labor market conditions in the area in which the individual is seeking work. [Emphasis added.]

LE § 8–903.

That Babendreier was "able to" and was "actively seeking" work is not contested. The record indicates that she pursued at least two jobs per week, as required by law. The pivotal issue is whether she was "available for work" when she did not seek non-guaranteed work assignments during the Pimlico meet.

Appellants argue that we should reverse the Board's decision because it did not follow the result that it reached in *Keller, supra.* In that case, Keller, a "Saturday/Holiday

Employee"[14] at Laurel Park and a "Regular Employee" at Pimlico, was disqualified from receiving unemployment benefits because she did not seek work at Laurel Park on days other than Saturdays and holidays. Keller, like Babendreier, did not seek work on additional days because the work was not guaranteed.[15] The hearing examiner in *Keller* noted that, "there is sufficient evidence to show that the claimant could reasonably have expected to work more than one day per week had she made the attempt. For this reason, it does not appear proper to find that [Keller] is working all available hours." The hearing examiner went on to conclude that "the claimant is not fully able, available, and actively seeking work" within the meaning of LE § 8–903(a)(1), and therefore, she was denied unemployment benefits "until such time as claimant meets the requirements of the law and demonstrates that her attempts to work would be unavailing." The Board affirmed that decision, pursuant to COMAR 09.32.06.04.A ("The Board may deny a petition for review if it agrees with the decision of the hearing examiner.").

We are unpersuaded by appellants' argument that the Board was bound by the *Keller* decision, either factually or as precedent,[16] as to render its decision in this case arbitrary and capricious. Keller sought employment at the Laurel Park meet, but limited her availability to Saturdays and holidays, the days for which she held seniority status. Babendreier, on the other hand, declined to work the entire Pimlico meet. Keller, as a "Saturday/Holiday Employee" at Laurel Park, held a higher seniority status than Babendreier, a "Days Worked" employee at Pimlico. Consequently, Keller had a greater guarantee of receiving a work assignment than had Babendreier.

---

**14.** The term "Saturday/Holiday Employee" is defined in the Agreement as "an employee who attained and continuously maintains Saturday/Holiday Seniority standing under Article 4[,]" *supra.*

**15.** The record does not reflect whether Keller sought other full-time work.

**16.** *See* COMAR 09.32.06.03.C., *infra.*

Moreover, only "[d]ecisions of the Board of Appeals designated as precedent by the Board constitute legal precedent for the hearing examiner's decisions." COMAR 09.32.06.03.C. The Board's decisions are somewhat analogous to our unreported opinions. Maryland Rule 8–114(a) states that "[a]n unreported opinion of the Court of Appeals or Court of Special Appeals is neither precedent within the rule of *stare decisis* nor persuasive authority." Therefore, the Board did not err by declining to treat *Keller* as precedent.

Appellants contend that the *Keller* decision was based on *Robinson v. Maryland Employment Sec. Board,* 202 Md. 515, 97 A.2d 300 (1953), in which the Court of Appeals noted that

[t]he purpose the [unemployment] law is designed to achieve, of protection against involuntary unemployment, is not frustrated by an interpretation that one who will work from 11:00 A.M. to 3:00 P.M. only has restricted her utility and desirability in the labor market to a point where she cannot be held to be "available" as that word is used in the context of the statute.

*Robinson,* 202 Md. at 522, 97 A.2d 300. The Court went on to hold that for an individual to be found unavailable, he or she must place restrictions on the days, time, place, or conditions of employment. The Court concluded that a cafeteria operator, laid off by her employer because of a reduction in staff, was unavailable for work when she restricted the hours during which she was willing to work. Here, Babendreier stated that she was available to work if appellants contacted her, i.e., if work was available. We do not believe that her request for notice of available work was equivalent to the general restriction Robinson placed on her employment.

In addition, in *Maryland Employment Sec. Bd. v. Poorbaugh,* 195 Md. 197, 72 A.2d 753 (1950), cited by the Board, the Court of Appeals considered three separate unemployment benefits claims. In all three instances, the Court held that the Board's denial of unemployment benefits was legally correct, basing its decision on the respective parties' failure to look for work or accept an offer to work. The Court stated:

A review of the testimony in the instant cases shows clearly that there was evidence to support the Board's findings. Mrs. Poorbaugh received a maternity leave, and at the time she registered with the Employment Service was fully occupied in taking care of her child. There was no evidence that she had made any effort to procure work, other than to "watch the ads." Mr. Feaster, whose employer contended that he had voluntarily quit his job, admitted that he [was] laid off because of the cold weather. The employer sent him word that if he didn't report "for work tomorrow he wasn't going to have any more work", but he did not report until about four months later, a month after he filed his claim. Mrs. Merbaugh was employed as a messenger. She resigned her job to get married. Under a rule of the Company[,] married women were not employed as messengers. She applied for a transfer to another department, but there was no vacancy. She admitted that since her marriage she had not applied for work elsewhere.

Since there was evidence to support the Board's findings and no suggestion of fraud, the court erred in attempting to substitute its judgment for that of the Board.

*Poorbaugh,* 195 Md. at 199–200, 72 A.2d 753. Again, we do not find these circumstances analogous to the present case. Here, the evidence supports the finding that Babendreier was laid off when live racing ended at Laurel Park, that she had not been offered a guaranteed employment opportunity at Pimlico, and that she was actively seeking work.

Appellants direct us to *GTE Products Corp. v. Unemployment Compensation Bd. of Review,* 141 Pa. Commw. 628, 596 A.2d 1172 (1991), in which a claimant for unemployment benefits worked for an employer who ceased production for a summer shutdown, lasting approximately one month. *GTE,* 596 A.2d at 1172–73. The employer encouraged its employees to take their vacation time during the shutdown period, but posted a sign-up sheet for employees interested in working during the shutdown. *Id.* at 1173. If an employee was available for work during the shutdown period, the employer would approve a request for vacation time during the remain-

ing portion of the year. *Id.* Unlike, Babendreier, however, the claimant, who had previously used her vacation time, did not make herself available for guaranteed work with her employer during the shutdown period.

*In re Beatty*, 286 N.C. 226, 210 S.E.2d 193 (1974), cited by the Board, however, is instructive. In *Beatty*, 126 longshoremen were deemed ineligible for unemployment benefits based upon a provision in their collective bargaining agreement, which required the longshoremen to report to work between 6:00 a.m. and 7:30 a.m., and if no work was available by 8:15 a.m., they could go to a part-time job. That agreement also provided supplemental benefits to those employees who were union members and sought employment, but who were unable to obtain a part-time job. The Supreme Court of North Carolina affirmed the decision of the Employment Security Commission that the claimants were not available for work because the reporting requirement effectively took the claimants out of the job market.

In this case, Babendreier, like the longshoremen, would have effectively removed herself from the labor market by reporting to Pimlico each day. What distinguishes *Beatty* from this case is that the agreement entered into by the longshoreman required them to report to work each day to be eligible for supplemental income benefits available to union members who were unable to work part-time jobs. Babendreier, on the other hand, was not required by contract to report daily to Pimlico, received no compensation for reporting to Pimlico, and was not guaranteed any work there.

The Board affirmed its hearing examiner's finding that Babendreier was laid off from her employment at Laurel Park because of the nature of the employer's business and not because of misconduct, and that she was "available for work" pursuant to LE § 8–903(a)(1)(ii), despite refusing to commute sixty miles to Pimlico and await a non-guaranteed work assignment. Had she spent many hours commuting to and waiting at Pimlico for a non-guaranteed work assignment, she would have been "unavailable" to other potential employers.

We conclude that the Board's decision is supported by substantial evidence and is not wrong as a matter of law. We therefore affirm the Board's decision granting Babendreier unemployment benefits.

**JUDGMENT AFFIRMED.**

**COST TO BE PAID BY APPELLANTS.**